**Mitchell Edward RUPE, Petitioner,**

v.

**Tana WOOD,[1] Superintendent of Washington State Penitentiary, and Kenneth O. Eikenberry, The Attorney General of the State of Washington.**

**No. C91–1635Z.**

United States District Court, W.D. Washington, Northern Division, at Seattle.

Sept. 19, 1994.

See also 863 F.Supp. 1315.

---

1. Tana Wood is substituted for James Blodgett pursuant to Fed.R.Civ.P. 25(d)(1).

David Allen, Richard A. Hansen, Todd Maybrown, Allen & Hansen, Seattle, WA, Kathryn Lund Ross, Jones, Ross, Besman & Connolly, P.S., Lynnwood, WA, for petitioner.

Mitchell Edward Rupe, pro se.

John Scott Blonien, John M. Jones, Paul Douglas Weisser, John Joseph Samson, Atty. Gen. Office, Corrections Div., Olympia, WA, Daniel G. Steele, U.S. Dept. of Justice, Environmental and Natural Resources Div., Washington, DC, for respondents.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE HANGING

ZILLY, District Judge.

This matter comes before the Court in connection with Mitchell Edward Rupe's petition for habeas corpus pursuant to 28 U.S.C § 2254, alleging that Petitioner's hanging would constitute cruel and unusual punishment because of his peculiar circumstances (Claim S.5.23). Petitioner contends that because of his excessive weight, he is likely to be decapitated if judicially executed in accordance with the State's protocol for hanging. (Pretrial Order, docket no. 228 at page 2). The Respondent has moved for summary judgment, docket nos. 112 and 168, relating to this claim. The Court held a hearing commencing on July 11, 1994, to hear testimony on this and other remaining issues. The Court has considered the testimony presented at the hearing and the briefs and other pleadings filed by the parties and now enters its Findings of Fact and Conclusions of Law relating to Claim S.5.23.

### FINDINGS OF FACT

1. Petitioner Mitchell Rupe has been sentenced to death under Washington State law.

2. Pursuant to RCW 10.95.180, the punishment of death in Washington shall be inflicted by hanging by the neck or, at the election of the defendant, by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death. P.T.O. ¶ 3.

3. As of September 2, 1993, Mitchell Rupe weighed 409¼ pounds and measured 6' ¼" in height. P.T.O. ¶ 2. Petitioner has struggled with weight problems throughout most of his life. After 8½ years of military service, Petitioner was honorably discharged in December, 1980 because he could not lose enough weight to meet new army regulations. Petitioner's obesity presents an unusual and exceptional circumstance which is likely to dramatically affect the execution process.

4. In Washington, execution by judicial hanging is carried out at the Washington State Penitentiary in Walla Walla, and is generally conducted pursuant to the Washington Field Instruction 410.500 ("Washington Field Instruction"). P.T.O. ¶ 4; Exhibit 15. The Washington Field Instruction requires use of manila hemp rope of a diameter between ¾ inch and 1¼ inches. The rope is soaked and then stretched. The knot is treated with wax, soap, and clear oils to ensure a smooth sliding action. P.T.O. ¶ 5.

5. The Washington Field Instruction uses a "long drop" method of hanging, in which the condemned person is dropped a particular distance based on his or her weight. The Washington Field Instruction contains altering drop lengths for persons ranging from 120 pounds to 220 pounds. Under the Washington Field Instruction, persons weighing more than 220 pounds will be dropped a distance of five (5) feet unless the Superintendent of the Washington State Penitentiary exercises the authority to deviate from the Field Instruction. P.T.O. ¶ 7.

6. Tana Wood is the Superintendent of the Washington State Penitentiary and the person who is now responsible for the preparation and carrying out of executions in the State of Washington. On December 7, 1993, Superintendent Wood testified during her deposition that Mitchell Rupe would be dropped a distance of five feet, as is set forth in the Washington Field Instruction, if judicially hanged at the weight of approximately 409 pounds. Superintendent Wood also testified, however, that she might consult with experts and the drop distance might be changed based on such consultation. P.T.O. ¶ 8.

7. At a telephone conference with counsel on May 9, 1994, the Court ordered the Respondent to determine by June 10, 1994, the drop length to be used for Mr. Rupe's hanging. Minutes, docket no. 203. On June 9, 1994, Superintendent Wood determined that Mr. Rupe would be dropped a distance of 3 feet 6 inches if judicially hanged at the weight of approximately 409 pounds, using a rope with a ⅞ inch diameter. Wood testified at the hearing that this decision was based upon advice given to her by Dr. Bahram Ravani, an engineering expert consultant hired by the State of Washington, as well as her observations of the hanging executions of Westley Allen Dodd ("Dodd") and Charles Rodman Campbell ("Campbell") which have recently been carried out at the Washington State Penitentiary. Wood received no input from medical experts in connection with this decision.

8. Wood testified that she made the decision to reduce the drop length to 3 feet 6 inches and to fix the rope size at ⅞ inch diameter in order to reduce or eliminate the possibility of decapitation.

9. The Washington Field Instruction relating to the drop lengths for persons of different weights is derived from a British study of hanging and the standard United States military drop chart for hanging. Before adopting the Washington Field Instruction, the State of Washington possessed very little information regarding the Army regulations. The source of the Army manual drop chart is unknown. The Army has never conducted a hanging execution pursuant to its regulations. The potential energy in foot-pounds which will result when a person is hanged can be calculated by multiplying the weight of the condemned person by the distance the person will be dropped. For example, a weight of 220 pounds and a drop distance of five feet would result in a potential energy total of 1100 foot-pounds. The British historically sought to utilize an energy level of 1260 foot-pounds during each judicial hanging. The Washington protocol calls for proposed energy levels slightly below the 1260 foot-pound level recommended by the British. Under the Washington protocol for hanging a 220 pound person (the

highest weight listed in the protocol) at a drop distance of five feet, the proposed energy level would be 1100 foot-pounds.

10. The goal of judicial hanging is to provide a quick and painless death without causing decapitation. The Washington method, like other "long drop" methods of judicial hanging, attempts to achieve this result by dropping the condemned person a sufficient distance to cause a fracture dislocation of the spinal column and a stretch injury of the spinal cord and lower brain stem, but not so far as to cause a decapitation. To avoid a decapitation, the forces applied must not be so great as to destroy the tissue surrounding the spinal column, which would result in a separation of the head from the body.

11. The potential energy level which would result from hanging Petitioner at a weight of 409¼ pounds using a drop length of 3 feet 6 inches would be 1432 foot-pounds. This is approximately a 30% increase in potential energy in foot-pounds from the level indicated for the highest weight of 220 pounds and drop distance of 5 feet in the Washington Field Instruction.

12. Charles Campbell was judicially hanged by the State of Washington on May 27, 1994. Prior to his death, Campbell was a muscular person who exercised frequently and his neck muscles were well developed and strong. He was in excellent physical shape. At the time of his execution, Campbell weighed 232 pounds.[2] The State used a ⅞ inch-diameter rope and a drop length of five (5) feet. This resulted in an expected energy level of approximately 1160 foot-pounds. Campbell's hanging resulted in a fracture separation of his cervical vertebrae C2 on C3, and a complete transection of the upper cervical spinal cord. Exhibit A–8. Campbell became unconscious immediately upon reaching the end of the rope, and death occurred very rapidly thereafter. Dr. Donald Reay, the Chief Medical Examiner for the King County, Washington, Medical Examiner's Office, performed the autopsy on Campbell and testified that there was no evidence of decapitation nor did he believe

that decapitation was imminent or threatened. There was no transection of skin or musculature. The extent of the injuries to Campbell's musculature could not be fully determined because of significant hemorrhage of the neck muscles. The carotid arteries were intact except for some minimal tears. However, Campbell suffered deep abrasions to the skin about the neck. Campbell's body hung in space for about five (5) minutes after death.

13. Dr. Reay testified and the Court finds that in the event Petitioner is dropped 3 feet 6 inches and the execution protocol contained in the Washington Field Instruction, Exhibit 15, is followed, unconsciousness will definitely occur as a result of occlusion of the carotid arteries in 6 to 10 seconds and that spinal shock will also occur which would virtually assure very rapid, if not immediate, unconsciousness. Dr. Reay did not give any opinion as to the likelihood of decapitation if these procedures are used.

14. The State of Washington contends that there is no risk of decapitation if Petitioner is hanged using a ⅞ inch-diameter rope and a 3 foot 6 inch drop length. The State relies upon tests conducted at the Washington execution chamber at Walla Walla, Washington, by their expert consultant, Bahram Ravani, Ph.D. Ravani holds formal degrees in mechanical engineering and has been involved in engineering aspects of biomechanics since 1979. Ravani has been associated with the Traffic Safety Research Corporation in Sunnyvale, California since 1979 working as a specialist in personal injury mechanics and accident reconstruction. Ravani relied on the medical testimony and opinions of Dr. Richard Mason, also associated with the Traffic Safety Research Corporation since 1979. The tests conducted by Ravani are outlined in Exhibit 60. In these tests Ravani dropped weights to simulate the hangings of Dodd, Campbell and Rupe. Ravani used a load cell connected to a computer to obtain readings measuring the peak dynamic forces in the rope at the end of each drop. The load cell readings represented the maximum

2. This total weight figure includes an eight-pound board strapped to Campbell's body at the time of execution.

force (load) applied to the neck of the prisoner at the time of execution. Ravani conducted only one valid test (Test 6) simulating Campbell's weight,[3] using a five foot rope that was ⅞ inch in diameter. The weight actually dropped 6.25 feet,[4] which resulted in a load cell reading of 4200 pounds.[5] At the hearing Ravani recalculated this load assuming a drop of 7 feet 3 inches, the drop length experienced by Campbell according to Dr. Mason's observations. At this drop length the load force exerted would be 4523 pounds. Ravani conducted only two valid tests (Tests 7 and 10) simulating Petitioner's weight. The first test (Test 7) involved a rope length of 60 inches (an actual drop length of 6.06 feet) and a 1.25 inch diameter rope. This test resulted in an indicated load force of 8600 pounds. When Ravani recalculated this test, using a 3 foot 6 inch drop length and a ⅞-inch diameter rope, he concluded that the load force would be 6059 pounds. Ravani testimony, Transcript at 117. The second test simulating Rupe's weight (Test 10) involved a drop length of 45.5 inches with a 1.25 inch diameter rope. This test resulted in an actual drop length of 5.58 feet and a load force of 8300 pounds. When Ravani recalculated this test using a rope length of 3 feet 6 inches and a ⅞ inch diameter rope, he concluded that the load force would be 5814 pounds. Ravani testimony, Transcript at 118. Ravani testified that Test 10 provided him with his best data. Ravani's tests show that, if Mr. Rupe were hanged using a ⅞ inch diameter rope and a 3.5 foot drop, his neck would experience between 28% (comparing Test 6, as adjusted for an actual drop of 7.25 feet, to Test 10) and 33% (comparing Test 6 to Test 7) more force than applied to Mr.

Campbell.[6] Although Ravani also conducted other tests at Walla Walla, only these tests provide any valid basis for his testimony and opinions. Ravani did not conduct any tests simulating Mr. Rupe's execution using a ⅞ inch diameter rope or a drop length of 3 feet 6 inches. Ravani's only two valid tests simulating Rupe's hanging resulted in estimated load levels of 8600 pounds of force (Test 7) and 8300 pounds of force (Test 10), before adjustment for rope diameter and drop length. The Court finds that little weight should be given to the opinions of Dr. Ravani based on the limited tests performed by him and his reliance on Dr. Mason's testimony. Ravani testified that, "I do not have an exact knowledge or information on the level of force and the time of force application that can cause decapitation in judicial hanging." Ravani Affidavit at ¶ 62.

15. The State also relied upon the testimony of Richard T. Mason, M.D., Forensic Pathologist–Coroner for the Sheriff of Santa Cruz County, California. Mason personally witnessed the execution of Charles Campbell, reviewed the autopsy photos, x-rays and MRI's of Campbell, and testified that in his opinion executing Mr. Rupe using a 3.5 foot drop and a ⅞ inch diameter rope "will result in a quick and painless death without decapitation." Mason Aff. at ¶ 11. Mason testified that the cervical spine separates at 600 to 700 pounds of force. Mason also testified that the spine provides approximately 25% of the neck strength, and the muscles and skin provide the remaining 75% of neck strength. Mason also testified that in his opinion the human neck could absorb 5000 pounds of dynamic force. The Court gives little weight to the testimony of Dr. Mason. In March

---

3. Ravani testified that the other test simulating Campbell's weight did not produce valid information.

4. Although the Washington Field Instruction, as modified by Superintendent Wood, prescribes an exact length of rope to be used, in fact the unrebutted evidence is that the rope will stretch and the person hung will actually fall a distance greater than the length of the rope. Dr. Ravani's tests support this conclusion. In addition, Dr. Mason, an expert called by the State, testified that Mr. Campbell was hanged using a 5.0 foot rope but actually fell approximately 7.25 feet. The Court finds that there will be some additional drop beyond the 3 foot 6 inch rope length if

Mr. Rupe is hanged and this will necessarily result in a greater force being applied to his neck.

5. All of Dr. Ravani's tests are measured in pounds of force rather than in terms of foot-pounds of energy as used by Dr. Tencer. Ravani estimated the force in pounds using load cell data equipment.

6. In the event Rupe actually dropped more than the 3 feet 6 inches, greater force would necessarily be applied. No estimates were provided by the witnesses concerning these additional forces.

1994, Mason testified by deposition that Rupe's hanging could be accomplished without decapitation using a drop length of 5 feet. He also testified at his deposition that there would be a greater risk of decapitation if a ⅞ inch rope was used instead of a 1.25 inch rope. At the hearing, Mason admitted that all of his initial opinions were wrong. Mason has not performed any tests and relies solely on his observation of Campbell's execution and the opinions of Dr. Ravani.

15. Dr. Ravani relied upon Dr. Mason in forming his own opinions on the recommended drop length for Mr. Rupe. Ravani Affidavit, docket no. 240, at ¶¶ 82 and 83. Dr. Ravani has no medical experience or training. Dr. Mason testified that the spine could absorb 700 pounds of dynamic force (which is 25% of the force the entire neck can absorb) and the neck muscles and skin could absorb 2100 pounds (which is 75% of the force the entire neck can absorb), and that 5000 total pounds of force will be applied to Rupe's neck if he is hanged using a ⅞ inch diameter rope and a drop length of 3.5 feet. Ravani admitted during cross examination that if Dr. Mason's estimates are correct, the total amount of force applied to Mr. Rupe's neck will exceed the total force the entire neck can absorb by 2200 pounds, and as a result of this excessive force, "there is a high chance of decapitation." Ravani Transcript at 87.

16. Petitioner contends that there is an 80%–90% risk of decapitation if Petitioner is hanged using a 3 foot 6 inch drop length and a ⅞ inch diameter rope. Petitioner relies upon the testimony of Alan Tencer, Ph.D. Tencer holds formal degrees in mechanical engineering and is the director of the Biomechanics Laboratory at Harborview Hospital in Seattle. Biomechanics is the application of basic principles of mechanics and mechanical engineering to the human body. Petitioner also relies upon the testimony of Donald P. Becker, M.D., Chief of Neurological Surgery at the University of California at Los Angeles Medical Center.

17. Dr. Tencer testified by affidavit, docket no. 234, dated June 29, 1994, that, "Because there have been no studies or research regarding the precise energy levels necessary to separate the head from the body in a judicial hanging, I cannot predict the outcome of a 3.5 foot hanging with the confidence level I feel in regard to a 5–foot hanging." Affidavit at ¶ 18. Tencer testified that based in part on the Campbell hanging, "I now believe that there is some significant risk of decapitation if the State of Washington drops Mr. Rupe a distance of 3.5 feet." Affidavit at ¶ 18. At the hearing, based in part on a more recent test conducted, Tencer stated that he believed there was a 80%–90% chance of decapitation under these circumstances. Dr. Tencer relied in part on a recent muscle tensility test he conducted on the neck tissue of a 71–year old male cadaver. Tencer testified that the spine could absorb a maximum energy force of approximately 800 foot-pounds, and the neck muscle and skin could absorb only an energy force of approximately 75 to 200 foot-pounds.[7] Based on Campbell's weight and a drop length of five feet, Tencer estimated that Campbell's hanging involved an energy of 1160 foot-pounds. Affidavit at ¶ 21. After hanging, Campbell's head remained attached to his body by the strength of only his neck muscles, larynx and skin. Tencer testified that the Rupe hanging would involve an energy level of 1435 foot-pounds (410 pounds multiplied by a drop length of 3.5 feet), which is 24% greater than the energy level in Mr. Campbell's case. Because of the additional energy that will be applied in the proposed Rupe hanging, Tencer concluded that decapitation is very likely to occur.

18. Dr. Becker also testified for the Petitioner. Becker testified that assuming a drop distance sufficient to disrupt Mr. Rupe's cervical column, it is his opinion that Rupe would be decapitated.

19. Judicial hanging results in a dynamic, rapid load which is applied to the cervical spine. The load is not applied in a pure axial

7. The testimony of Dr. Tencer that the spine could absorb approximately 80% of the energy force (800 foot-pounds compared to compared to the 1000 foot-pounds the total neck structure can absorb) is in direct contrast to Dr. Mason's testimony that the spine could absorb only 25% of the total force.

fashion but rather unequally to one side of the spinal column in a tearing, shearing fashion that proceeds across the spinal column from side to side or front to back.

20. None of the parties have produced scientific studies or tests which provide the Court with a firm basis to determine whether or not Mr. Rupe will be decapitated if hanged using a ⅞ inch-diameter rope and a drop length of 3.5 feet. Because of the human nature of judicial hanging, no definitive tests are possible. Decapitation has been reported to have occurred in connection with other judicial hangings. *See* Petitioner's Exhibits 38, 39, 40, 44 and 45. Petitioner's counsel have also produced graphic pictures showing the decapitation of Black Jack Ketchum in New Mexico in 1901. The Court finds that decapitation is a recurrent phenomenon in the history of judicial hanging. While it is difficult to quantify the frequency of decapitation and the precise cause of any particular decapitation which is described in the historical literature, it appears that there is some correlation between the size of the condemned person and the risk of decapitation. The historical literature supports a conclusion that decapitation is more likely to occur during a long-drop hanging when the condemned person has excessive body weight.

21. Based on testimony of the witnesses and the exhibits produced at the hearing, the Court finds that if Mr. Rupe is judicially hanged with a ⅞ inch diameter rope and a drop length of 3 feet 6 inches, and the Washington Field Instruction is followed, death will occur by separation of the vertebrae which will cause spinal cord transection and rapid or immediate unconsciousness and death. A person who is unconscious has no sensation of pain or suffering.

22. The Court further finds that if Mr. Rupe is judicially hanged in accordance with the State's protocol, the force dynamically applied to Rupe's neck will exceed that applied to the neck of Charles Campbell by at least 24–40%.

23. Based on the nature and extent of the injuries to Campbell and the limited tests conducted by the experts who testified at the hearing, the Court finds that Petitioner has established by credible evidence that there is a significant[8] risk of decapitation if Petitioner is judicially hanged using a drop length of 3.5 feet under the Washington protocol outlined in the Washington Field Instruction. In the event decapitation occurred, it would result in immediate or near immediate unconsciousness and death, and in mutilation to Rupe's body.

24. The Washington judicial hanging protocol, as modified by Superintendent Wood's decision to use a 3 foot 6 inch drop length for Petitioner, was not based on adequate investigation or reliable testing and does not eliminate the significant risk of decapitation if Petitioner is hanged.

25. The parties and their experts have focused their investigations and arguments on the State's decision to use a 3 foot 6 inch rope to hang Mr. Rupe. During the hearing, Dr. Tencer testified that, in his opinion, if Rupe were hanged using a drop length of 2.7 feet to 3 feet, Rupe would likely suffer the same injuries as Campbell and the risk of decapitation would be slight. Tencer Transcript at 16–17 (July 16, 1994). Dr. Ravani also testified that a drop of 3 feet would not result in decapitation for Mr. Rupe. However, Dr. Ravani also expressed concerns over using any drop length less than 3 feet 6 inches. Dr. Ravani told Superintendent Wood that any drop length less than 3 feet 6 inches would increase the risk of a less than instantaneous death. These opinions were provided without the benefit of tests or formal investigation of any kind. The Court finds that any reduction of the drop length below 3 feet 6 inches would decrease the risk of a fracture of the spinal cord and would increase the risk of death by strangulation. Death by strangulation would result in prolonged suffering prior to death.[9]

---

8. It is difficult to quantify the amount of risk in a percentage figure. The Court finds that the risk is less than the anticipated 24% to 40% increase in force but more than a slight risk.

9. By finding that a reduction of the drop length below 3 feet 6 inches would increase the risk of a less than instantaneous death, the Court is not suggesting that there is no available protocol at which Rupe could be hanged without risk of decapitation or prolonged pain or suffering. The

26. In the event decapitation occurs, it will result in mutilation to Rupe's body.

## CONCLUSIONS OF LAW

■ 1. The Eighth Amendment prohibits "cruel and unusual punishment." *Campbell v. Wood*, 18 F.3d 662, 681 (9th Cir.1994). Judicial hangings, as conducted pursuant to the Washington Field Instruction, generally do not violate the Eighth Amendment. *Id.* at 687. The issue presented here is whether the Washington Field Instruction, as modified by Superintendent Wood to accommodate Rupe's peculiar physical characteristics, violates the Eighth Amendment as it relates to Petitioner. Because the Court has found that there is a significant risk that Rupe's hanging will result in decapitation, the question is whether such decapitation violates the Eighth Amendment.

■ 2. The Eighth Amendment does not require a State's execution procedure to remove every single possibility of error. "The risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review." *Campbell*, 18 F.3d at 687. However, in this case, unlike *Campbell*, there is a significant risk of decapitation if Petitioner is hanged. Thus, the risk of decapitation cannot be dismissed as a "possible error" or "accident."

■ 3. Traditional methods of execution selected by a state's legislature are presumed to be valid. *Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859, 876 (1976). This is true, at least in part, "because the constitutional test is inter-twined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards." *Id.* The Washington State Legislature has selected hanging as a form of capital punishment. The Legislature has not selected, however, the drop length for a person weighing over 400 pounds, nor has it considered whether hanging would be proper if there was a significant risk of decapitation. Because of this, the State should not benefit from a presumption of validity in this case.

■ 4. The Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Public attitudes toward hangings that might carry a slight risk of decapitation cannot be equated with public attitudes toward hangings that carry a significant risk of decapitation. Objective indicia of this attitude, *see Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925, are found in the history of court decisions that list beheading as one of the traditional methods of execution barred by the Eighth Amendment. *See, e.g., Campbell*, 18 F.3d at 681; *Furman v. Georgia*, 408 U.S. 238, 264–65, 92 S.Ct. 2726, 2739, 33 L.Ed.2d 346 (1972) (Brennan, J. concurring); *Wilkerson v. Utah*, 99 U.S. 130, 135, 25 L.Ed. 345 (1879). No state has ever provided for execution by axe or guillotine. A hanging that is likely to result in decapitation is contrary to "public perceptions of standards of decency." *Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925.

Court is unable to determine, however, what that constitutionally acceptable protocol, if any, might be because the State has failed to present any reliable evidence on alternative drop lengths or protocols for hanging Mr. Rupe.

The State initially took the position that a drop length of five feet in accordance with the Washington Field Instruction would not result in decapitation. The State later retreated from that position, and it became necessary for the State to establish a protocol for hanging Mr. Rupe. Because of the unique nature of Rupe's hanging claim, which is itself based on a fluctuating variable (Rupe's weight), it was also necessary for the Court to set some finite parameters for resolving the issue. On May 9, 1994, the Court ordered the State to fully disclose by June 10,

1994, the length of the rope to be used for Rupe's hanging. After consulting with experts and conducting various tests, the State selected a drop length of 3.5 feet. The issue for the Court, therefore, was whether Rupe's hanging in accordance with the Washington Field Instruction, as modified by the Superintendent to accommodate Mr. Rupe's weight, would be constitutional. Based on all of the evidence presented, the Court concludes that such a hanging would violate the Eighth Amendment's prohibition on cruel and unusual punishment.

Petitioner has met his burden of showing that his hanging in accordance with the State's protocol would be unconstitutional. It is not for the Court to devise an appropriate protocol for hanging Mr. Rupe; that task belonged to the State.

5. Because the Court concludes that there is a significant risk that Rupe's hanging would result in decapitation, such a hanging would also violate basic human dignity, "which is the 'basic concept underlying the Eighth Amendment.'" *Gregg*, 428 U.S. at 173, 96 S.Ct. at 2925 (quoting *Trop*, 356 U.S. at 100, 78 S.Ct. at 597). Supreme Court cases discussing the history of the Eighth Amendment make clear that decapitation and similar mutilation, even if accomplished after death and thus perhaps without "unnecessary and wanton infliction of pain," offend basic human dignity. *See Furman*, 408 U.S. at 253–54, 92 S.Ct. at 2733–34; *Wilkerson*, 99 U.S. at 135.

6. The Court concludes that the hanging of petitioner under the procedures selected by the State of Washington would result in a significant risk of decapitation and therefore violates the Eighth Amendment to the United States Constitution.

7. Because of the significant risk of decapitation in this case, the Court would reach the same conclusion even if the presumption of constitutional validity attached to the State's decision concerning the appropriate drop length for Mr. Rupe.

8. Petitioner is entitled to have his writ of habeas corpus granted on Claim No. S.5.23.