93 F.3d 1434
 96 Cal. Daily Op. Serv. 6089, 96 Daily Journal
D.A.R. 9969
Mitchell Edward RUPE, Petitioner-Appellee-Cross-Appellant,
v.
Tana WOOD, Superintendent, Respondent-Appellant-Cross-Appellee.
 Nos. 94-99013, 94-99014.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 6, 1995.
Decided Aug. 15, 1996.
 
 Kathryn Ross, Jones, Ross, Besman & Connolly, Lynnwood, Washington, DC, Todd Maybrown, Allen, Hansen & Maybrown, Seattle, Washington, DC, for petitioner-appellee-cross-appellant.
 Christine O. Gregoire, Paul D. Weisser, John J. Samson, Assistant Attorneys General, Olympia, Washington, DC, for respondent-appellant-cross-appellee.
 Appeals from the United States District Court for the Western District of Washington, Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-91-01635-TSZ.
 Before: WALLACE, SCHROEDER and PREGERSON, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 This is an appeal by the Superintendent of the Washington State Penitentiary, Tana Wood, from a judgment of the district court granting a writ of habeas corpus to petitioner Mitchell Rupe. Rupe was convicted of first degree murder for the shooting deaths of two bank tellers and sentenced to death. The district court declined to disturb the underlying convictions but granted the writ and vacated the sentence on two grounds. First, it ruled that Rupe would suffer cruel and unusual punishment in violation of the Eighth Amendment if he were put to death by hanging, because Rupe weighs over 400 pounds and the planned execution could decapitate him. Second, the district court held that Rupe is entitled to a new penalty phase hearing, because the jury should have been allowed to consider a polygraph test of the state's chief witness as mitigating evidence. The polygraph test supports Rupe's theory that the witness, who was an accessory to Rupe's crimes, played a larger role than he admitted in the murders. The district court denied all of Rupe's other challenges to the penalty and guilt phases of his prosecution, and Rupe cross appeals.
 
 
 2
 We affirm the grant of a new penalty phase hearing so that the jury may consider the previously excluded polygraph evidence. We dismiss Wood's appeal and vacate the decision below as moot on the Eighth Amendment hanging issue because Washington law has changed. We affirm the district court on all issues raised in Rupe's cross-appeal.
 
 FACTS AND PROCEDURAL HISTORY
 
 3
 The facts and major contentions of both sides are thoroughly discussed in two published opinions of the Washington Supreme Court, State v. Rupe, 101 Wash.2d 664, 683 P.2d 571 (1984)("Rupe I ") and State v. Rupe, 108 Wash.2d 734, 743 P.2d 210 (1987)("Rupe II "), cert. denied, 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988), and two published opinions of the district court, Rupe v. Wood, 863 F.Supp. 1307 (W.D.Wash.1994) and Rupe v. Wood, 863 F.Supp. 1315 (W.D.Wash.1994). We summarize the background facts very briefly.
 
 
 4
 Rupe was convicted and sentenced to death for killing two bank tellers during a robbery of a Tumwater State Bank trailer branch in West Olympia, Washington. The robbery occurred in September of 1981, when Rupe was 27. The record reflects that Rupe had a productive career in the army until 1980 when he was honorably discharged because he was unable to meet new army weight standards. Following his discharge, Rupe's life became dysfunctional. See generally Rupe II, 108 Wash.2d at 780-82, 743 P.2d at 235-36 (dissenting opinion of Justice Pearson, discussing details of Rupe's civilian and military life).
 
 
 5
 The evidence against Rupe was strong. His victims, Candace Hemmig and Twila Capron, were found at approximately 11:00 a.m. by Capron's husband. Hemmig was dead and Capron did not survive massive brain injuries. Rupe's bloody checkbook was found on the bank counter, and Rupe himself approached an investigating officer at approximately 11:40 a.m. and told the officer that he had been in the bank that morning. After several interviews over the next few days, Rupe confessed, having been told by police officers that his polygraph results were causing them to question his credibility.
 
 
 6
 Rupe later recanted his confession. At trial he testified that two days before the actual robbery, he and his friend, Monte Yovetich, had gone to the bank to rob it, but Rupe could not go through with the plan. Rupe testified he had returned to the bank the day of the robbery to take care of an overdrawn account, and on his way out he saw Yovetich in the parking lot with a green satchel. Rupe testified he was concerned that Yovetich would rob the bank, because Rupe had lent his pistol, in the green satchel, to Yovetich two days before. Rupe explained that his confession stemmed from guilt for having planned the robbery, and a feeling of responsibility for the gun.
 
 
 7
 The state's principal witness was Yovetich. Yovetich admitted that he and Rupe had discussed robbing the bank, but Yovetich denied any involvement on the day of the shootings. Yovetich testified that after the robbery, Rupe confessed to him. According to Yovetich, Rupe robbed the bank and then stashed the green satchel with the money and the murder weapon in Yovetich's garage. Yovetich said that he and a friend spent some of the money and then threw the murder weapon under a bridge, which is where the police later recovered it.
 
 
 8
 Before trial, Yovetich was administered a polygraph examination in which he denied participation in the robbery and denied lying about throwing Rupe's pistol under the bridge. The polygraph examiner originally determined that Yovetich was untruthful in the examination, but later testified that the data was not entirely reliable because of Yovetich's nervousness, lack of sleep and hostility toward police.
 
 
 9
 The trial court refused Rupe's proffer of the Yovetich polygraph test during both the guilt and penalty phases of the trial. At that time, Washington state law disfavored admitting polygraph results into evidence absent a stipulation. State v. Renfro, 96 Wash.2d 902, 639 P.2d 737, cert. denied, 459 U.S. 842, 103 S.Ct. 94, 74 L.Ed.2d 86 (1982).
 
 
 10
 In Rupe's initial appeal to the Washington Supreme Court, the court affirmed his conviction, but ordered a new penalty phase hearing because evidence of Rupe's gun collection had erroneously been presented to the jury. Rupe I, 101 Wash.2d at 703, 683 P.2d at 594. The Washington Supreme Court rejected Rupe's argument that the polygraph results should have been admitted at both the guilt and penalty phases, resting its decision on the view that the polygraph results were too unreliable to merit consideration:
 
 
 11
 The [polygraph] evidence offered by the defendant simply does not reach the minimal threshold of reliability necessary to its admission in a criminal proceeding.
 
 
 12
 Id. at 690, 683 P.2d at 588.
 
 
 13
 On remand, the second penalty jury also sentenced Rupe to death, and the Washington Supreme Court upheld the second sentence on appeal. The Washington Supreme Court then conducted an independent statutory review of Rupe's sentence, as directed by Washington statute, RCW 10.95.100, and upheld the sentence after that review as well. Rupe's subsequent restraint petitions were similarly denied, as were his state habeas corpus petitions.
 
 
 14
 Rupe filed his federal habeas petition in 1990. The district court entered its judgment in September of 1994.
 
 
 15
 I. The State's Appeal.
 
 
 16
 A. Death by Hanging.
 
 
 17
 At the time Rupe was sentenced to death, a Washington prisoner sentenced to death would be executed by hanging unless the prisoner chose to die by lethal injection. Rupe, unwilling to select the method of his death, challenged his potential execution by hanging as cruel and unusual punishment in violation of the Eighth Amendment. The district court agreed that hanging Rupe would constitute cruel and unusual punishment, 863 F.Supp. 1307 (W.D.Wash.1994) and Wood appealed.
 
 
 18
 After Wood's appeal was argued, Washington amended its law, reversing the prior presumption in favor of hanging. Under current Washington law, a prisoner sentenced to death will be executed by lethal injection, unless the prisoner chooses to be hanged. RCW 10.95.180 (effective June 6, 1996). Wood therefore moved to have the portion of her appeal relating to hanging Rupe dismissed as moot. In response, Rupe suggested that the new statute might not apply to him because he was originally sentenced under the old law. Washington therefore affirmatively represented to this court that if Rupe is executed, he will be executed in accordance with the new law, stating that "Rupe will be executed by lethal injection, unless he elects judicial hanging or lethal injection is held to be invalid." Accordingly, we dismiss as moot the portion of Wood's appeal relating to Rupe's hanging, and vacate the concordant portion of the district court's opinion at 863 F.Supp. 1307.
 
 
 19
 B. The Polygraph Evidence.
 
 
 20
 Prior to Rupe's trial, Monti Yovetich, who was the state's key witness and an accessory to Rupe's crimes, took a polygraph examination. The polygraph examiner concluded that Yovetich was lying when he denied having anything to do with the killings. Rupe first proffered Yovetich's polygraph results during the guilt phase of his trial. At the time, Washington law excluded polygraph evidence unless all parties stipulated to its admissibility. Renfro, 96 Wash.2d 902, 639 P.2d 737. But, the Washington courts had also indicated that, given a strong enough showing that both modern polygraph technique and the particular polygraph results being proffered were reliable, they would consider deviating from the general rule barring polygraph evidence absent a stipulation. Cf. State v. Pleasant, 21 Wash.App. 177, 188-92, 583 P.2d 680, 687-88 (1978), cert. denied, 441 U.S. 935, 99 S.Ct. 2058, 60 L.Ed.2d 664 (1979); State v. Woo, 84 Wash.2d 472, 475, 527 P.2d 271, 273 (1974). Thus, the trial court heard testimony on the reliability of polygraphs in general and Yovetich's in particular; it noted that Yovetich's test had the types of weaknesses that generally make courts skeptical of polygraphs, and declined to deviate from the general Washington rule barring polygraph evidence. Rupe proffered the Yovetich polygraph evidence again during the first penalty phase of his trial, but once more, apparently for the same reasons, the trial court refused to admit it.
 
 
 21
 Rupe challenged both exclusions on appeal. Two weeks before the Washington Supreme Court decided Rupe's case it decided State v. Bartholomew, 101 Wash.2d 631, 683 P.2d 1079 (1984). Bartholomew recognizes that under controlling United States Supreme Court authority, relaxed standards govern the admission of mitigating evidence during the penalty phase of a death penalty trial. Id. at 645-46, 683 P.2d at 1088, (citing Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Bartholomew held that under these relaxed standards, mitigating polygraph evidence may be admitted if (1) the prosecution can cross-examine on the reliability of the results, and (2) the trial judge is convinced that the polygraph examiner was qualified and that the exam was conducted under proper conditions. Id. at 646, 683 P.2d at 1089.
 
 
 22
 When the Washington Supreme Court decided Rupe's case, it once again stated that more relaxed standards govern evidentiary rulings in the penalty phase, yet without further analysis or discussion of Bartholomew, it held that the Yovetich polygraph evidence was properly excluded because "we cannot go so far as to permit clearly unreliable evidence to be introduced." 101 Wash.2d at 691, 683 P.2d at 571.
 
 
 23
 The trial court, however, had never found that Yovetich's polygraph was "clearly unreliable." The trial court record shows that although the examiner had doubts about the exam conditions, the examiner felt the tests were valid and conclusive when he first reviewed them.
 
 
 24
 The district court held that under the controlling standards laid down by the United States Supreme Court, the polygraph evidence should have been admitted. The Supreme Court in Lockett stated that the jury, in considering whether to impose a death sentence, may not be precluded from considering any aspect of a defendant's character or record proffered as mitigating evidence:
 
 
 25
 [W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.
 
 
 26
 Lockett, 438 U.S. at 604, 98 S.Ct. at 2964-65. The district court decided that exclusion of relevant evidence because of doubts about reliability violated the principle of Lockett and Eddings by interfering with the jury's ability to weigh mitigating factors. See id.; Eddings, 455 U.S. at 113-14, 102 S.Ct. at 876. We observe that a similar principle was emphasized in McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), where the Supreme Court struck down North Carolina's rule that a jury may only consider those mitigating factors found unanimously, explaining that "the State [can not] save the unanimity requirement by characterizing it as a standard of proof intended to ensure the reliability of mitigating evidence." McKoy, 494 U.S. at 443, 110 S.Ct. at 1233.
 
 
 27
 Here, the district court reasoned that there may be cases where potentially mitigating evidence can be excluded on reliability grounds, provided that the proffered evidence is so unreliable that it has no probative value at all; but, the district court concluded that this was not such a case. Rupe v. Wood, 863 F.Supp. at 1341 n. 22. In so holding, the district court also relied upon our own decision in Mak v. Blodgett, 970 F.2d 614 (9th Cir.1992), cert. denied, 507 U.S. 951, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993), where we said that a court can exclude evidence at the penalty phase if it is irrelevant, but cannot preclude "any relevant mitigating evidence." 970 F.2d at 623, (quoting Skipper v. South Carolina, 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986)).
 
 
 28
 We review de novo the district court's holding that, under the Eighth and Fourteenth Amendments, the Yovetich polygraph was wrongly excluded. Campbell, 18 F.3d at 681.
 
 
 29
 In her appeal, Wood first argues that Rupe waived any objection to the exclusion of Yovetich's polygraph by failing to reoffer the polygraph results at his second penalty phase hearing. 863 F.Supp. at 1352 See Jeffers v. Lewis, 38 F.3d 411, 418 n. 2 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1995) (no constitutional violation for failing to consider mitigating circumstance that defendant neglects to argue). Id. We agree with the district court, however, that after Rupe I had held the Yovetich polygraph evidence inadmissible, any attempt to reoffer those polygraph results would have been futile. Id. The trial court would have considered itself bound to exclude the polygraph as unreliable under Rupe I, and could not have reconsidered the polygraph evidence under the relaxed standards delineated in Bartholomew, a case that Rupe I postdates. Id. Thus, Rupe was not required to reoffer the polygraph results in order to appeal the constitutionality of their exclusion. Id. See R.B. Matthews, Inc. v. Transamerica Transp. Serv., Inc., 945 F.2d 269, 272 n. 2 (9th Cir.1991) (failure to make offer of proof excused where it would be redundant, unnecessary, or futile).
 
 
 30
 Wood next argues that the district court, in holding that the Yovetich polygraph was wrongly excluded, announced a sweeping new rule requiring the admission of all mitigating evidence, no matter how unreliable. Wood contends that this rule is unsupported by the governing precedents and that applying it in Rupe's case would violate the principles announced by the Supreme Court in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Wood's position, however, mischaracterizes the district court's holding. The district court did not hold that all mitigating evidence, regardless of reliability, must be admitted. Rather, it acknowledged that wholly unreliable evidence may be excluded. We agree with Wood that a trial court need not accept, for example, astrology, or other evidence of no demonstrated scientific validity. See generally Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). But the district court's decision expressly authorizes exclusion of such completely untrustworthy evidence. 863 F.Supp. at 1341 n. 22.
 
 
 31
 Nor did the district court announce any "new rule" not recognized as generally applicable at the time of Rupe's trial and hence not applicable in habeas proceedings. See Teague v. Lane, 489 U.S. at 305-10, 109 S.Ct. at 1073-75. The district court endeavored, faithfully and successfully, to follow earlier announced constitutional standards of general applicability stemming from Lockett and Eddings. See, e.g., Bartholomew, 101 Wash.2d 631, 683 P.2d 1079.
 
 
 32
 Wood's other principal contention on appeal is that Rupe offered the Yovetich polygraph only to show that Yovetich, rather than Rupe, killed the victims and that the polygraph was thus offered only to exploit the jury's "lingering doubt" about Rupe's guilt. Wood argues that under Franklin v. Lynaugh, 487 U.S. 164, 172-74, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988), lingering doubt is not a relevant mitigating factor. Id. at 174, 108 S.Ct. at 2327 (explaining that lingering doubts are not germane to mitigation because they are "not over any aspect of petitioner's 'character,' 'record' or a 'circumstance of the offense' ").
 
 
 33
 The district court agreed with Wood that Rupe should not be allowed to use the Yovetich polygraph in the penalty phase solely to play on the jury's lingering doubts about Rupe's guilt. But the district court correctly held that Rupe may use evidence that shows he did not play as great a role in the offense as the prosecution would like the jury to believe. See generally Mak, 970 F.2d at 623. Here, Yovetich indisputably played some role in the offenses, for he disposed of the murder weapon after the robbery and spent some of the robbery proceeds. Furthermore, Rupe did argue to the jury that Yovetich could have played a larger role in the murders. Therefore, the issue of relative culpability was before the jury. Since relative culpability is an appropriate mitigating factor, the Yovetich polygraph is relevant insofar as it bears on the question of what role Yovetich truly played in Rupe's crimes. Id. The evidence was also relevant to the state's theory, for the prosecutor argued to the jury that Yovetich told the truth to the police and that "there is not one shred of evidence other than Mr. Rupe's statement that Mr. Yovetich did it." The polygraph results would have refuted that assertion. Thus, we conclude that the district court correctly ruled the evidence was relevant.
 
 
 34
 Finally, the state argues that if there was error in the failure to admit the evidence, the error was harmless. The district court, in a post-trial order, expressly ruled that under the standards of Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the petitioner met his burden of showing that the exclusion of the polygraph evidence had a "substantial and injurious effect on the verdict because there is a reasonable probability that, had the evidence been admitted, it would have substantially influenced at least one juror's balancing of aggravating and mitigating factors." We agree. There was a clear issue of relative credibility, as well as culpability, as between Rupe and Yovetich. The lack of the polygraph evidence enabled the prosecutor to impugn, persuasively, Rupe's credibility before the jury. There was, in addition, substantial mitigating evidence through many witnesses. See generally Rupe II, 108 Wash.2d at 780-82, 743 P.2d at 235-36 (dissenting opinion of Justice Pearson, discussing evidence in mitigation).
 
 
 35
 We therefore affirm the district court's holding that the refusal to admit the polygraph evidence at the second penalty phase hearing violated Rupe's due process rights to have relevant, mitigating evidence concerning the circumstances of the crime presented to the jury deciding between a penalty of life or death.
 
 
 36
 II. The Rupe Cross-Appeal.
 
 
 37
 A. Washington's Statutory Death Penalty Review.
 
 
 38
 The Washington Supreme Court is required to conduct an independent statutory review of all Washington death sentences. RCW 10.95.100.[1] It must determine whether (1) sufficient evidence supports the jury's finding that mitigating factors do not merit leniency, (2) death is proportionate to punishments imposed in similar cases, and (3) the sentence is the product of passion or prejudice. RCW 10.95.130.[2] If the answer to any of these questions undermines the validity of the death penalty, then, pursuant to RCW 10.95.140,[3] the Washington Supreme Court must invalidate the death sentence and remand for resentencing.
 
 
 39
 Rupe argues that the Washington Supreme Court violated the scheme by failing to conduct a statutory review, to determine whether Rupe's sentence was the product of "passion or prejudice," before it remanded for a new penalty phase trial in Rupe I. Rupe argues that this alleged violation of Washington law effectively punished him for exercising his right to appeal and thereby deprived him of federal due process rights. Specifically, Rupe contends that if he had forgone his direct appeal in Rupe I, the court would have (1) done the "passion or prejudice" review, and (2) found that Rupe's sentence was the product of "passion or prejudice" because the jury heard wrongly admitted evidence about Rupe's gun collection. Under Rupe's theory of Washington law, the court would then have been required to commute Rupe's death sentence to life imprisonment.
 
 
 40
 The district court, however, disagreed and explained that under Washington law, the Washington Supreme Court is not required to commute a sentence to life just because the sentence is the product of "passion or prejudice." The Washington Supreme Court may remand for a new penalty phase trial if another hearing could cure the "passion or prejudice." Further, Rupe received a new penalty phase trial, as the result of the wrongfully admitted gun evidence, following his direct appeal in Rupe I. Thus, Rupe would not have been better off had he forgone his direct appeal.
 
 
 41
 The district court's view of Washington law is correct. The Washington Supreme Court has explained that when it remanded for a new penalty phase trial in Rupe I, it was not permitted, under Washington law, to commute Rupe's sentence to life. Order of November 3, 1992. Rather, Washington's statutes only allow the Supreme Court to commute a sentence to life when no further legal proceedings are available:
 
 
 42
 If any sentence of death imposed pursuant to this chapter is commuted by the governor, or held to be invalid by a final judgment of a court after all avenues of appeal have been exhausted by the parties to the action, or if the death penalty established by this chapter is held to be invalid by a final judgment of a court which is binding on all courts in the state, the sentence for aggravated first degree murder if there was [a death sentence] shall be life imprisonment as provided in RCW 10.95.030(1).
 
 
 43
 RCW 10.95.090. This reasoning would have applied even if the Washington Supreme Court had done a statutory review in Rupe I. A sentence that is found to be the product of "passion or prejudice" because of a garden variety evidentiary error should not be commuted to life imprisonment if a further proceeding could cure that error. Rupe's contention that the Washington Supreme Court misapplied Washington law and punished Rupe for exhausting his direct appeals is without support.
 
 
 44
 B. Constitutionality of the Statutory Review.
 
 
 45
 Washington's statutory review scheme requires the supreme court to decide, inter alia, whether any given death sentence is "disproportionate to the penalty imposed in similar cases." See RCW 10.95.130(2)(b). Rupe maintains that meaningful proportionality review under this scheme is foreclosed because there are no adequate definitions for "similar cases" or "disproportionate." These shortcomings, concludes Rupe, relying on Harris, By and Through Ramseyer v. Blodgett, 853 F.Supp. 1239 (W.D.Wash.1994) (Bryan, J.), aff'd, 64 F.3d 1432 (9th Cir.1995), violate his due process rights.
 
 
 46
 The Harris case, however, was a fact-specific ruling. The court there identified at least five problems that Harris faced because of the proportionality review statute. Those problems do not appear in this record. First, in Harris the majority of the Washington Supreme Court was not able to find any cases that it considered similar to Harris', Harris, 853 F.Supp. at 1288, and the statutory scheme did not give an alternative procedure for review when no similar cases were found. Id. at 1289. Thus, the statute gave "little guidance" in Harris. Id. at 1288. Neither of these problems was an issue in Rupe II, as the majority found that eight cases were similar to Rupe's. In Harris some of the Washington Supreme Court's statements "amount[ed] to findings of fact," yet the review statute created no mechanism for the court to resolve disputed factual issues. Id. at 1290. Here, Rupe has not argued that the Washington Supreme Court engaged in any fact finding. Nor has Rupe developed the record to show that he lacked notice of what types of cases the court would consider, which was another factor in the Harris case. Id. at 1289. Moreover, in Rupe's case, the majority and the dissent both selected "similar" cases based on whether the cases had aggravating factors in common with Rupe's case, and thus the majority and the dissent focused in the main on the same cases. 108 Wash.2d at 766-71, 786-88, 743 P.2d at 228-30, 238-39. Given the record in this case, we decline to find that the review was so inadequate that Rupe was essentially deprived of any review, and due process will not recognize a less egregious injury. Campbell v. Blodgett, 997 F.2d 512, 522 (9th Cir.1992), cert. denied, 510 U.S. 1215, 114 S.Ct. 1337, 127 L.Ed.2d 685 (1994).
 
 
 47
 Rupe also argues that Wood is collaterally estopped from defending the proportionality review scheme because Washington did not appeal the part of the Harris decision holding that Harris' proportionality review violated his due process rights. Because the Harris decision was intimately tied to the facts in that case, Rupe's collateral estoppel argument must also fail.
 
 
 48
 C. Voluntariness of Confession.
 
 
 49
 Rupe maintains that his confessions to the police were involuntary because his will was overborne by the officer who administered his polygraph exam. See Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) (whether confession was voluntary turns on whether defendant's will was in fact overborne). The record shows that the examiner spoke at length to Rupe after Rupe had voluntarily taken the polygraph examination. The examiner told Rupe he appeared to have failed the exam and would be better off if he cooperated rather than having the examiner report the results to the investigatory officers. The examiner suggested he could conduct more polygraph tests that might help if Rupe cooperated. Rupe argues that the examiner's statements constituted improper threats and promises.
 
 
 50
 The question of the voluntariness of a confession is a legal issue that requires an independent federal determination. Id. at 110, 106 S.Ct. at 449 (1985). The Washington Supreme Court examined the challenged statements in context and concluded there were no threats or promises, but merely "psychological appeals to defendant's conscience." Rupe I, 101 Wash.2d at 679, 683 P.2d at 582. This was essentially a factual conclusion, which is entitled to a presumption of correctness under 28 U.S.C. § 2254(d). Miller, 474 U.S. at 117, 106 S.Ct. at 453 (subsidiary questions, such as the length of the interrogation or defendant's prior experience with the legal system, are factual matters on which we defer to the state court). Given the vagaries of the examiner's statements to Rupe, we cannot conclude that Rupe's polygraph examiner overbore his will with improper threats or promises. The district court was correct when it held that Rupe's confession was voluntary.
 
 D. Admission of the Gun Collection Evidence
 
 51
 At Rupe's first penalty phase trial, evidence of Rupe's gun collection was improperly admitted. Rupe I, 101 Wash.2d at 703, 683 P.2d at 594. Further, the evidence spanned some 25 pages of the trial transcript and was "the crux of the prosecution's argument to the jury for the defendant's death." Id. at 708, 683 P.2d at 597. Thus, the Washington Supreme Court remanded for a second penalty phase hearing. At that second hearing, a prosecution witness twice mentioned several of Rupe's guns, once when the witness was describing the contents of Rupe's car, and once when the witness listed the firearms Rupe admitted to owning.
 
 
 52
 Wood conceded, before the district court, that this gun collection testimony was inadmissible under Rupe I, and thus violated state law. Rupe v. Wood, 863 F.Supp. at 1344. Nevertheless, the district court found that the limited admission of the gun collection evidence at the second penalty phase trial did not "so fatally infect[ ] the proceedings as to render them fundamentally unfair," Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991), and thus the evidence did not violate Rupe's due process rights. 863 F.Supp. at 1347. In so holding, the district court noted that (1) the improper testimony lasted only a few moments and did not describe the guns beyond naming them, (2) the gun testimony was embedded in longer testimony on other subjects, (3) the prosecutor did not call attention to the improper testimony at the time it was offered or in closing, nor did the prosecution portray Rupe as a "commando" as it did in the first hearing, (4) the other evidence against Rupe was weighty, and (5) Rupe himself had offered evidence of his interest in guns in mitigation. Id. at 1345-46.
 
 
 53
 We hold that under these circumstances, the district court did not err in concluding that this minimal presentation of gun collection evidence was not a violation of Rupe's due process rights.
 
 
 54
 E. Ineffective Assistance of Counsel.
 
 
 55
 Rupe next argues that he received ineffective assistance of counsel at both his penalty phase retrial and on appeal. He points to three shortcomings of his counsel at his second penalty phase trial. First, Rupe notes that his counsel did not object to prosecution testimony, discussed supra, about Rupe's gun collection. The district court correctly held that Rupe's counsel's failure to object to the gun collection evidence was deficient performance under Strickland v. Washington, 466 U.S. 668, 678, 687, 104 S.Ct. 2052, 2059-60, 2064, 80 L.Ed.2d 674 (1984). But, to prevail on this claim, Rupe must also show that "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. at 2069. As discussed above, the jury's exposure to the gun evidence was cursory, and we find no reasonable probability that it bore on any juror's decision to sentence Rupe to death. The district court was correct to reject this claim.
 
 
 56
 Second, Rupe argues that his counsel should have found an expert to testify to the reliability of Yovetich's polygraph, and then should have made another attempt to admit the polygraph at the second penalty phase trial. The district court found that in light of the holding in Rupe I that the polygraph was "clearly unreliable," and the trial court's indication that it would follow that holding, the decision by Rupe's counsel not to pursue the issue was not deficient performance. 863 F.Supp. at 1328-29. As we held, supra, any attempt to reoffer the Yovetich polygraph after Rupe I would have been futile. Because the failure to take a futile action can never be deficient performance, the district court was correct to reject this claim.
 
 
 57
 Third, Rupe argues that he received ineffective assistance of counsel when his attorney failed to take remedial action in response to the prosecution's improper cross examination of Rupe. The prosecution questioned Rupe on his supposed confession to another death row inmate, but never produced the inmate to verify Rupe's statements, which is improper under Washington law. See State v. Babich, 68 Wash.App. 438, 842 P.2d 1053 (1993). Rupe's counsel, however, testified that he did not believe the questions were harmful to Rupe. 863 F.Supp. at 1331. Thus, the district court found that Rupe's counsel's failure to take curative action was within the reasonable range of professional assistance. 863 F.Supp. at 1330. We agree.
 
 
 58
 Finally, Rupe contends that he received ineffective assistance of counsel on appeal. Such claims are also reviewed under the Strickland standard. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989). Rupe argues that because the Washington Supreme Court had once reversed because of the improper admission of gun collection evidence, his attorney erred by not raising the issue for a second time in Rupe II. The district court, correctly, agreed. But, the district court found that "Rupe was not prejudiced by his counsel's failure to raise the gun issue on appeal because there is no reasonable probability that Rupe would have prevailed on the issue had it been raised." 863 F.Supp. at 1332. We agree with the district court. The jury's cursory exposure to evidence of Rupe's other guns would not, in all probability, be enough for the Washington Supreme Court to find that Rupe was prejudiced and reverse for a third penalty phase hearing.
 
 
 59
 F. Cumulative Error.
 
 
 60
 Finally, Rupe contends that the numerous errors discussed above resulted in cumulative error in the guilt phase of Rupe's trial. We agree with the district court, however, that there was no violation of federal rights in connection with the guilt phase of Rupe's trial. Thus, there is no reason to reverse for cumulative error.
 
 
 61
 AFFIRMED.
 
 
 
 [1]
 10.95.100
 Mandatory review of death sentence by supreme court--Notice--Transmittal--Contents of notice--Jurisdiction
 Whenever a defendant is sentenced to death, upon entry of the judgment and sentence in the trial court the sentence shall be reviewed on the record by the supreme court of Washington.
 Within ten days of the entry of a judgment and sentence imposing the death penalty, the clerk of the trial court shall transmit notice thereof to the clerk of the supreme court of Washington and to the parties. The notice shall include the caption of the case, its cause number, the defendant's name, the sentence imposed, the date of entry of judgment and sentence, and the names and addresses of the attorneys for the parties. The notice shall vest with the supreme court of Washington the jurisdiction to review the sentence of death as provided by this chapter. The failure of the clerk of the trial court to transmit the notice as required shall not prevent the supreme court of Washington from conducting the sentence review as provided by this act.
 
 
 [2]
 10.95.130
 Questions posed for determination by supreme court in death sentence review-Review in addition to appeal-Consolidation of review and appeal
 (1) The sentence review required by RCW 10.95.100 shall be in addition to any appeal. The sentence review and an appeal shall be consolidated for consideration. The defendant and the prosecuting attorney may submit briefs within the time prescribed by the court and present oral argument to the court.
 (2) With regard to the sentence review required by this act, the supreme court of Washington shall determine:
 (a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4); and
 (b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120;
 (c) Whether the sentence of death was brought about through passion or prejudice; and
 (d) Whether the defendant was mentally retarded within the meaning of RCW 10.95.030(2).
 
 
 [3]
 10.95.140
 Invalidation of sentence, remand for resentencing-Affirmation of sentence, remand for execution
 Upon completion of a sentence review:
 (1) The supreme court of Washington shall invalidate the sentence of death and remand the case to the trial court for resentencing in accordance with RCW 10.95.090 if:
 (a) The court makes a negative determination as to the question posed by RCW 10.95.130(2)(a); or
 (b) The court makes an affirmative determination as to any of the questions posed by RCW 10.95.130(2)(b), (c), or (d).
 (2) The court shall affirm the sentence of death and remand the case to the trial court for execution in accordance with RCW 10.95.160 if:
 (a) The court makes an affirmative determination as to the question posed by RCW 10.95.130(2)(a); and
 (b) The court makes a negative determination as to the questions posed by RCW 10.95.130(2)(b), (c), and (d).