**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAM KIRKPATRICK, JR., *Petitioner-Appellant*, <br><br> v. <br><br> KEVIN CHAPPELL, Warden, California State Prison at San Quentin, *Respondent-Appellee.* | No. 14-99001 <br><br> D.C. No. 2:96-cv-00351-WDK <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
William D. Keller, District Judge, Presiding

Argued and Submitted February 17, 2017
Pasadena, California

Original Opinion Filed October 10, 2017

Panel Rehearing Granted July 18, 2018

Re-argued and Submitted December 10, 2018
San Francisco, California

Original Opinion Withdrawn June 13, 2019

Filed June 13, 2019

Before:  Kim McLane Wardlaw, Carlos T. Bea,
and Morgan Christen, Circuit Judges.[*]

Opinion by Judge Bea

## SUMMARY[**]

### Habeas Corpus / Death Penalty

The panel filed (1) an order withdrawing the original opinion and (2) a new opinion affirming the district court's denial of William Kirkpatrick's habeas corpus petition challenging his capital sentence for two first-degree murders.

In its order withdrawing the original opinion, the panel explained that this case was originally decided by a panel comprised of Judge Stephen Reinhardt, Judge Kim McLane Wardlaw, and Judge Alex Kozinski. Appellee's petition for panel rehearing and rehearing en banc was pending when

[*] This case was originally decided by a panel comprised of Judge Stephen Reinhardt, Judge Kim McLane Wardlaw, and Judge Alex Kozinski. Appellee's petition for panel rehearing and rehearing en banc was pending when Judge Kozinski retired. Following Judge Kozinski's retirement, Judge Christen was drawn by lot to replace him. Following the death of Judge Reinhardt, Judge Bea was drawn by lot to replace him. Ninth Circuit General Order 3.2.h. The newly constituted panel granted Appellee's petition for rehearing before a three-judge panel on July 18, 2018. The newly constituted panel re-heard argument on December 10, 2018. The filing of this opinion serves to withdraw the original opinion.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Kozinski retired. Following Judge Kozinski's retirement, Judge Christen was drawn by lot to replace him. Following the death of Judge Reinhardt, Judge Bea was drawn by lot to replace him. The newly constituted panel granted Appellee's petition for rehearing before a three-judge panel, and the newly constituted panel re-heard the appeal.

In its opinion, the panel affirmed the district court's denial of Kirkpatrick's claim that his Eighth Amendment right against arbitrary and capricious sentencing was violated by the jury's consideration, at the penalty phase of his trial, of evidence that he threatened a person's property and poisoned her dogs. The panel assumed that the claim was exhausted, and it concluded that, even under the more favorable standard of de novo review, Kirkpatrick was not entitled to relief. The panel assumed without deciding that the error of California law in allowing the jury to consider the threats and poisoning as aggravating evidence amounted to constitutional error under the Eighth Amendment. The panel held that Kirkpatrick failed to show that he was prejudiced because, in light of the substantial aggravating evidence presented in comparison to the minimal mitigation evidence, absent the improperly-considered facts, the jury still would have found that the aggravating circumstances outweighed the mitigating circumstances and therefore would have been required to impose the death penalty. Thus, any constitutional error was harmless.

Expanding the certificate of appealability, the panel addressed Kirkpatrick's claim that district court erred in dismissing as unexhausted the claims from his state court habeas petition that the California Supreme Court deemed waived. Kirkpatrick argued that the California Supreme Court erred in finding that he validly waived his state habeas

petition because he was not competent to withdraw his petition, and his waiver was not voluntary, knowing, and intelligent. The panel deferred to the California Supreme Court's factual determinations that Kirkpatrick was competent and that his waiver was knowing and intelligent. As to the mixed question of law and fact whether the waiver was voluntary, the panel deferred to the California Supreme Court's underlying factual findings. The panel concluded that Kirkpatrick had not rebutted by clear and convincing evidence the California Supreme Court's finding of waiver.

The panel declined to expand the certificate of appealability as to the district court's dismissal as unexhausted of a penalty-phase claim of ineffective assistance of counsel.

---

## COUNSEL

Patricia Ann Young (argued) and Mark R. Drozdowski, Deputy Federal Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

A. Scott Hayward (argued), Deputy Attorney General; James William Bilderback II, Supervising Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

BEA, Circuit Judge:

## I. BACKGROUND

In September 1983, William Kirkpatrick was arrested and subsequently tried and convicted for robbing a Taco Bell restaurant in Burbank, California and for murdering two Taco Bell employees in the course of his robbery. He was 23 years old. The two victims, one of whom was 16 years old, were later found stuffed in a closet; both had been shot in the head, "execution style." Because the California Supreme Court's opinion in *People v. Kirkpatrick*, 874 P.2d 248 (Cal. 1994) (in bank), *disapproved of on other grounds by People v. Doolin*, 198 P.3d 11, 36 n.22 (Cal. 2009), explains the details of Kirkpatrick's brutal double murder, we do not restate them here.

### A. *Kirkpatrick's Trial*

More relevant to Kirkpatrick's appeal is the procedural history of his case. After the guilt phase of Kirkpatrick's trial, the jury deliberated for five days. The jury found Kirkpatrick guilty on two counts of first-degree murder, burglary, and robbery. The jury also found that because Kirkpatrick was convicted of two murders and the murders were committed during the commission of a robbery and burglary, special circumstances existed under California Penal Code § 190.2 that rendered Kirkpatrick eligible for the death penalty.

During the penalty phase of Kirkpatrick's trial, the jury was tasked with deciding whether Kirkpatrick should receive the death penalty or a sentence of life imprisonment without parole. Cal. Penal Code § 190.3. The prosecution and defense had the opportunity to present aggravating and mitigating evidence to the jury to support their arguments

regarding which sentence Kirkpatrick should receive. The prosecution presented aggravating evidence of Kirkpatrick's character and his other troubling actions. First, Stephen Thomas told the jury that when he was 16, Kirkpatrick became angry with him while they were drinking at a park after he refused to assist Kirkpatrick in a violent robbery. Thomas stated that Kirkpatrick dragged him to the park restroom, choked him, and tried to stick his head in a toilet.

Another witness, Jacob De Binion, testified that when he was 17, he met Kirkpatrick in a Der Wienerschnitzel restaurant parking lot and accepted Kirkpatrick's invitation to drink beer in the back of a van. After having a few drinks together, De Binion testified that Kirkpatrick physically forced him to perform oral sex and kiss him and threatened to kill him if he refused.

Finally, Shirley Johnson testified that Kirkpatrick left his calculator, bicycle, and projector at her house in late May 1983. Kirkpatrick attempted to retrieve his belongings from her house, but his calculator was nowhere to be found. Kirkpatrick subsequently made numerous phone calls to Johnson and threatened to "do damage" to her dogs, daughter, house, and herself if his calculator was not returned.

In late June 1983, Johnson came home and found that her two dogs had been poisoned and temporarily paralyzed. Later, Kirkpatrick called Johnson to tell her that he had "taken care" of the dogs. Kirkpatrick's defense counsel objected to Johnson's testimony about Kirkpatrick's dog poisoning and property threats, and argued that making threats to property and poisoning dogs were not facts that may be considered as aggravating evidence under California Penal Code § 190.3, which permits the jury to consider only

violent acts and threats of violence to people. The court overruled defense counsel's objection without explanation.

The defense's mitigation presentation consisted solely of Kirkpatrick's testimony, in which he reasserted his innocence and said he aspired to be a writer. Kirkpatrick's lawyers spoke to his mother in preparation for the mitigation presentation and told the court that she would be "very, very helpful to the defense," but Kirkpatrick ordered his lawyers not to contact or present any family members as witnesses.

After both sides rested, the court instructed the jury. Relevant here, the court told the jury:

> Evidence has been introduced for the purpose of showing that Defendant Kirkpatrick has committed the following acts:
>
> 1. Oral copulation by means of force upon Jacob De Binion, age 17;
>
> 2. An assault upon Stephen Eugene Thomas;
>
> 3. Making threatening telephone calls to Ms. Shirley Johnson;
>
> 4. Administering poison to animals;
>
> Which involved the express or implied use of force or violence or the threat of force or violence. Before you may consider any such criminal acts as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the Defendant Kirkpatrick did commit such criminal acts.

You may not consider any evidence of any other criminal acts as an aggravating circumstance.

In closing argument, the prosecutor noted the absence of mitigating factors from Kirkpatrick's presentation. He urged the jury to impose the death penalty because the aggravating evidence outweighed the mitigating evidence. He also relied heavily on the dog poisoning incident to highlight Kirkpatrick's character:

We brought in Shirley Johnson. Shirley Johnson committed the crime of having the defendant's calculator and he wanted the calculator back.

So what did the defendant do? The defendant made a series of threatening phone calls. "I will get you; I'll get your dogs and I'll get your children. Your daughter."

The next day or a few days later, Mrs. Johnson came home and her dogs were paralyzed. A few days later she gets a phone call from Mr. Kirkpatrick.

"I have taken care of your dogs. You and your daughter are next. Give me back my calculator."

. . .

What does it show you about Mr. Kirkpatrick? It shows you he is a man who has callousness, a callous disregard for the

> feelings of other people. This person who is absolutely amoral and will stop at nothing to get what he wants. He will go so far as to poison Mrs. Johnson's dogs to get his calculator.

The prosecutor continued: "With the Johnsons, he had a choice. He had a choice to leave [them] alone and get his calculator back some other way: but he chose to poison the dogs and to make threats. . . . Mr. Kirkpatrick is here right now because of choices he made. . . . I would ask you to think about that when you think about pity, when you think about sympathy."

At closing argument, Kirkpatrick told the jury that he had not received a fair trial.[1] He argued that his attorneys failed to call certain witnesses and ask specific questions. He said he was "frightened" and "mad" that prosecutors were sending an innocent person to jail. He also told jurors that he did not blame them for finding him guilty and that he would have done the same thing if he had been in their position.

Prosecutors rebutted Kirkpatrick's closing argument by suggesting that Kirkpatrick was "an anarchist" and that his only contribution to society was "to inflict havoc, pain and suffering on innocent people." The prosecution reminded

---

[1] Throughout his criminal trial, appeals, and habeas proceedings, Kirkpatrick has repeatedly tried to represent himself or to interfere with his defense counsel. After the trial court denied his request to serve as co-counsel during the guilt phase of his trial, Kirkpatrick threatened not to attend the penalty phase unless he could proceed *pro se*. The trial court denied his request to proceed *pro se*, but the court granted him co-counsel status for the penalty phase of his trial. Accordingly, Kirkpatrick and his counsel each addressed the jury directly during the penalty phase.

the jury that Kirkpatrick made deliberate choices to kill two Taco Bell employees; to force Jacob De Binion to perform oral sex and kiss him; to assault Stephen Thomas after he refused to help him with a violent burglary; and to threaten Shirley Johnson, her daughter, and her dogs to retrieve his calculator. The prosecution concluded by stating that because the aggravating factors "so far outweigh anything in mitigation," the jury "shall impose the penalty of death."

The jury began its penalty deliberations on June 19, 1984. Several hours into deliberating on June 20, 1984, the jury sent a note to the court asking: "[W]hat [are] the legal definitions for aggravating and mitigating circumstances as they apply to the instructions in making the determination of this sentence?" The court responded that the jury members "have been given all the legal definitions [they] need [and that] [a]ll other words have their common definitions." On June 21, 1984, the jury returned a death verdict for both murders.

At Kirkpatrick's sentencing hearing on August 14, 1984, Kirkpatrick moved to modify the verdict imposing the death penalty. The court reviewed the aggravating circumstances and stated that the only mitigating factors were Kirkpatrick's lack of prior felony convictions and his young age of 23. Because the court found that the aggravating circumstances outweighed those in mitigation, it denied Kirkpatrick's motion to modify the verdict and imposed a sentence of death.

## B. *Kirkpatrick's Direct Appeal and State Habeas Petition*

In 1988, Kirkpatrick filed an automatic direct appeal with the California Supreme Court as provided by the California Constitution. Cal. Const. art. VI, § 11, subsec. a. Kirkpatrick argued, in relevant part, that the trial court

violated state law and his Eighth Amendment rights when it instructed the jury that it may consider evidence of Kirkpatrick's dog poisoning and property threats as aggravating circumstances in deciding whether to impose the death penalty. Specifically as to his Eighth Amendment argument, Kirkpatrick argued that allowing the jury to consider those facts violated the Supreme Court's "narrowing" requirement that a capital sentencing scheme must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." He further argued that these statements "were highly prejudicial" and had "minimal, if any, legal relevance to the important issue of whether the death penalty should be imposed."

The California Supreme Court affirmed Kirkpatrick's conviction and sentence in a lengthy published opinion. *Kirkpatrick*, 874 P.2d at 269. The court held that evidence of Kirkpatrick's dog poisoning and property threats was admissible as a matter of state law because it showed the surrounding circumstances of Kirkpatrick's threats to harm Johnson's daughter. *Id.* at 263. The court did, however, hold that the trial court erred in instructing the jury that it could consider evidence that Kirkpatrick threatened Johnson's property and poisoned her dogs as aggravating circumstances in determining whether to impose the death penalty because California Penal Code § 190.3 allows the jury to consider "only those threats of violent injury that are directed against a person or persons." *Id.* at 264. It nevertheless found that the error was harmless. *Id.* at 264–65.

As to Kirkpatrick's Eighth Amendment argument, the court explained that California law performs its required narrowing at the eligibility phase, not the penalty selection

phase of the trial.  *Id.* at 264.  As a result, it held that the aggravating factors considered at the penalty selection phase are not relevant to whether the State's scheme adequately narrows the class of persons who receive the death penalty. *Id.*  Because the court found that Kirkpatrick's Eighth Amendment argument was "founded upon a mistaken understanding of the purpose of aggravating and mitigating circumstances in [California's] death penalty scheme," it denied him relief on his Eighth Amendment claim.  *Id.*

## C. *Kirkpatrick's Federal Habeas and State Habeas Exhaustion Proceedings*

On January 18, 1996, nine days before his scheduled execution, Kirkpatrick initiated habeas proceedings in the United States District Court for the Central District of California.  On June 24, 1998, Kirkpatrick filed his federal habeas petition.  The district court dismissed more than 20 of Kirkpatrick's claims as unexhausted but found good cause to stay his petition pending exhaustion of his claims in state court.  Kirkpatrick subsequently filed a habeas petition to exhaust his claims in the California Supreme Court on December 30, 1998.

While his state habeas exhaustion petition was pending, on July 23, 2000, Kirkpatrick sent a handwritten letter to the California Supreme Court, with an attached handwritten form titled, "Waiver Form."  His handwritten "Waiver Form" stated: "I *do not* wish to proceed with my petition for writ of habeas corpus review in this matter.  I wish the sentence and the judgement [sic] of execution in *People v. William Kirkpatrick Jr.*, 14-590144 to be carried out at this time."

In response, the California Supreme Court appointed Marin County Superior Court Judge Stephen Graham as a

referee to determine whether Kirkpatrick was competent to waive his petition and whether his waiver was voluntary, knowing, and intelligent. At first, Kirkpatrick cooperated. He appeared before the referee with his lawyers from the Federal Public Defender's (FPD) office for status conferences on four occasions in late 2000. Kirkpatrick was also evaluated by a court-appointed psychiatrist, Dr. McEwen, for two and a half hours. Following Dr. McEwen's examination, however, Kirkpatrick declined to take part in the process any further. He refused to be interviewed by three experts retained by the FPD, doctors Robert Weinstock, Xavier Amador, and Roderick Pettis.

He also refused to attend the referee's evidentiary hearing in March 2001. There, Dr. McEwen testified that Kirkpatrick was competent to waive his habeas petition and he had no "mental disease, disorder or defect." She also opined that if Kirkpatrick decided to waive his state habeas exhaustion petition, his decision to proceed on his own and represent himself would be voluntary, knowing, and intelligent. Although the FPD-supplied experts did not have the opportunity to meet with Kirkpatrick in person, they reviewed Dr. McEwen's report and each testified that her conclusions were not adequately supported. However, each FPD expert also testified that he was not in a position to express a diagnostic conclusion as to Kirkpatrick's competence because he did not interview Kirkpatrick personally.

Referee Judge Graham credited Dr. McEwen's opinions over the FPD experts' opinions because he thought they were "based upon extraordinary qualifications of training and experience, careful review of the available history, and perhaps the only substantial mental health interview Mr. Kirkpatrick has ever allowed." Based on Dr. McEwen's

opinions and his interactions with Kirkpatrick, the referee concluded that Kirkpatrick had voluntarily requested to withdraw his state habeas exhaustion petition and was competent to do so. But because Kirkpatrick "refused to engage in sufficient discussion" with the referee to permit him to make a more specific determination, the referee fell short of concluding that Kirkpatrick's waiver was "knowing" or "intelligent." The referee submitted his findings in a report to the California Supreme Court, along with the hearing transcripts, Dr. McEwen's written report, and copies of relevant exhibits, letters, and briefs. The California Supreme Court adopted the referee's conclusion that Kirkpatrick was competent to withdraw his state habeas exhaustion petition, but—differing from the referee's conclusion—also found that he "made a knowing, intelligent, and voluntary waiver of his right to proceed." As a result, the California Supreme Court summarily granted Kirkpatrick's request and dismissed his state habeas exhaustion petition as waived.

Back in federal court in December 2001, Kirkpatrick's lawyers filed an amended federal habeas petition, including the claims from his state habeas exhaustion petition that the California Supreme Court had deemed waived. Kirkpatrick then filed a pro se request to waive his amended federal petition. The district court, however, denied the request after Kirkpatrick again refused to participate in a competency evaluation.

After the state moved to dismiss the claims Kirkpatrick had waived in state court on grounds that such claims were unexhausted, Kirkpatrick argued that his waiver in the California Supreme Court was invalid because it was not voluntary, knowing, and intelligent. The district court upheld the California Supreme Court's conclusion that the

waiver in state court was valid, and it dismissed as unexhausted all the state claims in Kirkpatrick's amended federal habeas petition that had been part of his waived state habeas exhaustion petition.

In making this determination, the district court applied 28 U.S.C. § 2254(d) deference to the California Supreme Court's finding that Kirkpatrick's waiver had been voluntary, knowing, and intelligent. It stated, "Under [the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)], the decision of the California Supreme Court must be given deference, and cannot . . . be reviewed *de novo* by this court." Rather, the district court noted that its "power to review the decision of the California Supreme Court is extremely limited." Applying this highly deferential standard, the district court concluded that because "there is evidence to support the conclusory findings of the California Supreme Court," its conclusion must be upheld. To be sure of its decision, the district court also conducted its own analysis and concluded there was evidence to support the California Supreme Court's finding of waiver. *See* Appendix 1. The court then concluded that "[t]here has been no unreasonable determination of the facts or a decision contrary to, or involving an unreasonable application of, clearly established federal law." As a result, the district court dismissed as unexhausted all the claims Kirkpatrick had presented in his state habeas exhaustion petition.

On June 9, 2011, Kirkpatrick filed a revised amended federal habeas petition asserting the exhausted claims that had been presented to the California Supreme Court on direct appeal. In Claim 17(C) of his revised amended federal habeas petition, Kirkpatrick argued that allowing the jury to consider the facts that he poisoned Shirley Johnson's dogs and threatened her property during the penalty phase of his

trial violated his Eighth Amendment right against arbitrary and capricious sentencing. Following the logic of the California Supreme Court, the district court interpreted Kirkpatrick's claim as directed to the narrowing requirement under California Penal Code § 190.2, and not to the choice of punishment under California Penal Code § 190.3. Like the California Supreme Court, the district court denied Kirkpatrick's Eighth Amendment claim on the theory that the special circumstances of California Penal Code § 190.2—not the factors for penalty selection set out in § 190.3—perform the constitutionally required narrowing function. The district court further agreed with the California Supreme Court that any error of state law was "harmless because the magnitude and circumstances of the underlying crimes were such that the result would not have been any different even if the objectionable evidence had not been admitted." The district court granted Kirkpatrick a certificate of appealability on Claim 17(C), and this appeal followed.

## II. ANALYSIS

### A. *Kirkpatrick's Eighth Amendment Claim*

The district court certified only one issue for appellate review: Claim 17(C) of Kirkpatrick's revised amended federal habeas petition, regarding whether the jury's consideration of the facts that he threatened Shirley Johnson's property and poisoned her dogs at the penalty selection phase of his trial violated Kirkpatrick's Eighth Amendment right against arbitrary and capricious sentencing. To obtain relief on this claim, Kirkpatrick must show that the jury's consideration of these facts amounts to prejudicial constitutional error. *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015).

As a threshold issue, there is some doubt whether Kirkpatrick properly raised this issue on appeal.**[2]**

---

**[2]** The Supreme Court has long drawn a distinction between the "narrowing" and "selection" phases of capital sentencing as it applies to cruel and unusual punishment under the Eighth Amendment. The "narrowing" phase requires that states define the circumstances that place a defendant in the class of people eligible for the death penalty. *Zant v. Stephens*, 462 U.S. 862, 878 (1983). States must limit judges' and juries' discretion to impose the death penalty on a defendant because giving them unfettered discretion to decide who receives the death penalty is "cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." *Furman v. Georgia*, 408 U.S. 238, 239–40 (1972) (per curiam); *see also Godfrey v. Georgia*, 446 U.S. 420 (1980); *Gregg v. Georgia*, 428 U.S. 153 (1976).

By contrast, the "selection" phase occurs after a jury has found that a defendant is eligible for the death penalty and must decide whether to sentence the defendant to death or life imprisonment without parole. In contrast to the requirement during the narrowing phase that states must limit judges' and juries' discretion in determining who is eligible for the death penalty, the Court has stated that the selection stage requires only "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879 (emphasis in original).

To the California Supreme Court and the federal district court, Kirkpatrick appears to have raised his Eighth Amendment argument only in context of the narrowing phase and not the penalty selection phase. Accordingly, the California Supreme Court and federal district court addressed Kirkpatrick's Eighth Amendment argument as one that alleged his rights were violated at the narrowing phase of his trial, not the penalty selection phase of his trial. But on appeal to this court, Kirkpatrick argues that independent of any narrowing that took place during the guilt phase of his trial to determine whether he was eligible for the death penalty, the jury's consideration of the facts that he threatened Johnson's property and poisoned her dogs at the penalty selection phase resulted in the arbitrary and capricious infliction of the death penalty in violation of the Eighth Amendment. Kirkpatrick also argues that his Eighth Amendment claim is exhausted because he fairly

Nonetheless, we assume without deciding that Kirkpatrick's certified claim is exhausted because it makes no difference to the result. *See* 28 U.S.C. § 2254(b)(2).

Next, the parties dispute what standard of review applies to Kirkpatrick's Eighth Amendment claim. The warden argues that AEDPA applies because Kirkpatrick's habeas petition was filed in 1998, after AEDPA was enacted. Kirkpatrick does not dispute that his habeas petition is generally subject to AEDPA's standards, but argues that we should apply *de novo* review to his Eighth Amendment claim because the California Supreme Court did not adjudicate the claim on the merits. *See Johnson v. Williams*, 568 U.S. 289 (2013). Again, we need not decide this issue because we deny Kirkpatrick relief even under the more favorable standard of *de novo* review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." (citing 28 U.S.C. § 2254(a)). Additionally, regardless of what standard of review applies, to obtain relief, Kirkpatrick must prove the claimed error was not

---

presented it to the California Supreme Court and federal district court, and they merely improperly construed his argument as only a narrowing argument.

We have doubts as to whether Kirkpatrick's Eighth Amendment argument concerning the penalty selection phase of his trial was fairly presented to the California Supreme Court and federal district court. However, because we may deny Kirkpatrick's habeas petition on the merits notwithstanding his failure to exhaust his Eighth Amendment claim in state court, 28 U.S.C. § 2254(b)(2), we analyze the merits of his Eighth Amendment claim.

harmless—that a trial error of federal law "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted). Indeed, "a prisoner who seeks federal habeas corpus relief must satisfy [the harmless error standard established in *Brecht*], and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Davis*, 135 S. Ct. at 2199 (citing *Fry v. Pliler*, 551 U.S. 112, 119–20 (2007)). Thus, we proceed to analyze the merits of Kirkpatrick's Eighth Amendment claim.

Kirkpatrick contends that his Eighth Amendment rights were violated when the trial court allowed the jury to consider evidence that Kirkpatrick poisoned Shirley Johnson's dogs and threatened damage to her property because those acts are not enumerated under California Penal Code § 190.3, which explains the type of evidence the jury may consider when determining whether to impose a sentence of death or life imprisonment without parole. The parties do not dispute that the jury should not have considered those acts as aggravating evidence. Indeed, the California Supreme Court held that although the evidence was admissible to provide context to Kirkpatrick's threats against Johnson's daughter, "the court should have modified the [jury] instructions to delete references to poisoning animals and threatening injury to property." *Kirkpatrick*, 874 P.2d at 263–64. The court explained that California Penal Code § 190.3 permits the jury to consider "only those threats of violent injury that are directed against a person or persons," not animals or property. *Id.* at 264 (citing *People v. Boyd*, 700 P.2d 782, 792–93 (Cal. 1985) (in bank)).

While we recognize that the jury's consideration of Kirkpatrick's dog poisoning and property threats was error

under California state law, *Kirkpatrick*, 874 P.2d at 263–64, we assume without deciding and solely for the sake of argument that this error amounts to constitutional error under the Eighth Amendment, because "that does not necessarily mean that [Kirkpatrick] is entitled to habeas relief," *Davis*, 135 S. Ct. at 2197.  On collateral review, "[f]or reasons of finality, comity, and federalism," habeas petitioners must also show the trial error "resulted in 'actual prejudice.'"  *Id.* (quoting *Brecht*, 507 U.S. at 637).  Under this test, relief is proper only when a federal court "is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict."  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted).

Kirkpatrick has not shown he was prejudiced by the jury's consideration of Shirley Johnson's testimony that Kirkpatrick threatened her property and poisoned her dogs.  In California, once the jury has determined that a special circumstance exists under California Penal Code § 190.2 that renders the defendant eligible for the death penalty, it must then determine whether to impose on the defendant a sentence of death or life imprisonment without parole under California Penal Code § 190.3.  Section 190.3 instructs, in relevant part:

> After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and *shall* impose a sentence of death if the trier of fact concludes that the aggravating

> circumstances outweigh the mitigating circumstances.

Cal. Penal Code § 190.3 (emphasis added). This means that after excluding the aggravating facts that were considered in error, if the other aggravating circumstances outweigh the mitigating circumstances, the jury would still be required to sentence Kirkpatrick to death.

Besides the evidence that Kirkpatrick poisoned Johnson's dogs and threatened to damage her property, the prosecution presented substantial aggravating evidence of Kirkpatrick's immoral and callous character, which Kirkpatrick does not challenge. First, the jury could consider the circumstances of the crime of conviction—his "execution style" double-murder of two Taco Bell employees. Cal. Penal Code § 190.3, factor (a). Second, the jury could consider the presence of criminal activity by the defendant that involved the use or threat of force or violence against a person. *Id.* factor (b); *Kirkpatrick*, 874 P.2d at 264. Under this factor, the jury could consider Stephen Thomas's testimony that when he was sixteen, Kirkpatrick dragged him to a park bathroom, choked him, and tried to stick his head in a toilet. Another witness, Jacob De Binion, testified that he once accepted Kirkpatrick's invitation to drink beer in the back of a van, and Kirkpatrick physically forced him to perform oral sex and kiss him and threatened to kill De Binion if he refused. Further, even if the jury improperly considered the portions of Shirley Johnson's testimony referring to property threats and dog poisoning, Kirkpatrick does not challenge that the jury could consider that Kirkpatrick threatened to "do damage" to Johnson and her daughter if she did not find and return Kirkpatrick's calculator.

By contrast, the *only* mitigating evidence presented to the jury comprised Kirkpatrick's testimony explaining that he did not want to involve his family in his trial, reasserting his innocence, and noting that he aspired to be a writer and would write in prison if given the chance. In light of the substantial aggravating evidence presented in comparison to the minimal mitigation evidence, absent the improperly-considered facts, the jury still would have found that the aggravating circumstances outweighed the mitigating circumstances and therefore would have been *required* to impose the death penalty. Thus, we are not left with grave doubt that the jury's consideration of Kirkpatrick's property threats and dog poisoning had a substantial and injurious effect on the jury's decision. *Brecht*, 507 U.S. at 637. We hold, therefore, that any constitutional error arising from the jury's consideration of these facts was harmless. *Davis*, 135 S. Ct. at 2197.

## B. *Kirkpatrick's Uncertified Claims*

Although the district court certified only one issue for appeal, Kirkpatrick has briefed two additional uncertified issues. Pursuant to Ninth Circuit Rule 22-1(e), if a petitioner elects to brief any uncertified issues alongside the certified issues, it will be "construed as a motion to expand the [certificate of appealability (COA)] and will be addressed by the merits panel to such extent as it deems appropriate."

Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues were 'adequate to deserve encouragement to proceed

further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

In his first uncertified claim (his "waiver claim"), Kirkpatrick argues that the district court erred in dismissing as unexhausted the claims from Kirkpatrick's state habeas exhaustion petition that the California Supreme Court deemed waived.  Kirkpatrick argues that the California Supreme Court erred in finding that he validly waived his state habeas exhaustion petition because he was not competent to withdraw his petition, and his waiver was not voluntary, knowing, and intelligent.  In his second uncertified claim, Kirkpatrick alleges that the district court erred in dismissing his original penalty-phase ineffective assistance of counsel claim as unexhausted.  There, he argues that his trial counsel failed to investigate "to uncover any and all available mitigating evidence to present at the penalty phase of a capital trial."  We think Kirkpatrick's waiver claim merits further discussion, but we agree with the district court that his original ineffective assistance of counsel claim is unexhausted.  We decline to address it because it fails to meet the standard warranting certification.

As to Kirkpatrick's waiver claim, we consider whether the California Supreme Court erred in granting Kirkpatrick's request to waive his state habeas exhaustion petition based on its conclusion that he was competent to waive his petition and his waiver was voluntary, knowing, and intelligent.

### 1.  Standard of Review

First, Kirkpatrick argues that *de novo* review should apply to the question whether he validly waived his state habeas exhaustion petition in the California Supreme Court. When Kirkpatrick presented this argument to the district court, it disagreed and held that it owed deference to the

California Supreme Court's finding of waiver under 28 U.S.C. § 2254(d). We agree with the district court that we owe deference to the California Supreme Court's finding of waiver, but not under 28 U.S.C. § 2254(d).

Under 28 U.S.C. § 2254(d), a habeas petition seeking relief from a state court's judgment "shall not be granted with respect to any claim that was adjudicated on the merits," unless it (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The Supreme Court has defined "claim" as used in 28 U.S.C. § 2254 as "an asserted federal basis for relief from a state court's judgment of conviction." *Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005). And an adjudication on the merits is "a decision finally resolving the parties' claims . . . that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) (citation omitted).

Kirkpatrick's handwritten "Waiver Form" to the California Supreme Court requesting to withdraw his state habeas exhaustion petition is not "an asserted federal basis for relief from a state court's judgment of conviction." *Gonzalez*, 545 U.S. at 530. If we were to conclude that his waiver was invalid, Kirkpatrick would not be entitled to relief from his state court conviction; rather, he could merely continue litigating the merits of the claims contained within his state habeas exhaustion petition. Additionally, because his withdrawal is a waiver of his right to pursue habeas relief, it is not a decision resolving his claims based on the

substance of his habeas petition.  Thus, under § 2254(d) alone, we would not be subject to AEDPA's deferential framework.

However, under § 2254(e)(1), in proceedings evaluating a prisoner's habeas petition, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)). Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits.  Rather, it appears to apply to all factual determinations made by state courts. *See Sophanthavong v. Palmateer*, 378 F.3d 859, 866–67 (9th Cir. 2004); *Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003).  Thus, we defer to the California Supreme Court's factual determinations unless Kirkpatrick provides clear and convincing evidence that its factual findings were wrong.

Whether a petitioner is competent to withdraw his habeas petition is a question of fact, *Massie ex rel. Kroll v. Woodford*, 244 F.3d 1192, 1194 (9th Cir. 2001), and the parties agree this inquiry is generally subject to deference under § 2254(e)(1).  Likewise, whether a waiver is knowing and intelligent is a question of fact, *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc), and thus this inquiry is also subject to deference under § 2254(e)(1).[3]

---

[3] Kirkpatrick argues that the panel need not defer to the California Supreme Court's factual findings under § 2254(e)(1) because its factual findings resulted from a deficient fact-finding process.  But "before we can determine that the state-court [fact-finding] process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014). "Rather,

However, whether a waiver is voluntary is a mixed question of law and fact. *Id.*; *Collazo v. Estelle*, 940 F.2d 411, 415–16 (9th Cir. 1991) (en banc) (reviewing *de novo* the voluntariness of a confession and reviewing for clear error whether a waiver was knowing and intelligent). Pre-AEDPA, we reviewed *de novo* mixed questions of law and fact; but after AEDPA was enacted, our court, sitting en banc, found that AEDPA "restricts the scope of federal review of mixed questions of fact and law." *Jeffries v.*

---

we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id.* If not, we must presume the state court's factual findings are correct. *Id.*; 28 U.S.C. § 2254(e)(1).

We recognize that there was no in-depth questioning as to whether Kirkpatrick "appreciate[d] the consequences of his decision, that he underst[ood] the possible grounds for appeal but d[id] not wish to pursue them, and that he ha[d] a reason for not delaying execution." *Dennis ex rel. Butko v. Budge*, 378 F.3d 880, 889 (9th Cir. 2004); *Whitmore v. Arkansas*, 495 U.S. 149, 165–66 (1990). But that is only because Kirkpatrick chose not to attend several evidentiary hearings the referee scheduled, not because of any failing on the state court's part.

Additionally, though it is unusual that the California Supreme Court made its own factual determinations after reviewing the evidence and the referee's findings, that is simply a function of that court's *de novo* fact-finding power in habeas cases. *See In re Thomas*, 129 P.3d 49, 53 (Cal. 2006). The California Supreme Court was not bound by the referee's findings and was free to make its own factual determinations. *Id.*

To the extent we harbor any doubts about the peculiarities in the process here, mere doubts are not enough to discount the California Supreme Court's factual findings, and Kirkpatrick has presented no other evidence that its fact-finding process was otherwise deficient. Thus, we defer to the California Supreme Court's factual findings regarding Kirkpatrick's waiver of his state habeas exhaustion petition under 28 U.S.C. § 2254(e)(1).

*Wood*, 114 F.3d 1484, 1498 (9th Cir. 1997) (en banc) (citing 28 U.S.C. § 2254(e)), *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc). Specifically, we held that "[*d*]*e novo* review is no longer appropriate; deference to the state court factual findings is." *Id.*[4] To review the California Supreme Court's conclusion on the mixed issue of voluntariness, we "must first separate the legal conclusions from the factual determinations that underlie it." *Lambert*, 393 F.3d at 977–78. "Fact-finding underlying the state court's decision is accorded the full deference of [§ 2254(e)(1)]." *Id.* at 978. Because Kirkpatrick challenges only the factual findings underlying the California Supreme Court's conclusion that his waiver was voluntary, we defer to those factual findings under § 2254(e)(1).[5]

Kirkpatrick cites to *Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) (en banc) and *Moran v. Godinez*, 57 F.3d 690 (9th Cir. 1994), to support his assertion that we should apply *de novo* review to the finding of a voluntary waiver because it is a mixed question of law and fact. Of course, these cases pre-date AEDPA and our holdings in *Lambert* and *Jeffries*. 393 F.3d at 977–78; 114 F.3d at 1498. Moreover, even pre-AEDPA cases held that the factual issues underlying the

---

[4] Our original published opinion, now withdrawn, was premised on the conclusion that mixed questions of fact and law are reviewed *de novo*. *See Kirkpatrick v. Chappell*, 872 F.3d 1047, 1057 n.6 (9th Cir. 2017) (withdrawn). However, we now recognize that *Jeffries* requires a different standard. 114 F.3d at 1498. That analytical change drives the different outcome reached in the opinion issued today.

[5] We need not address what standard of review would apply to the California Supreme Court's legal conclusion as to voluntariness because Kirkpatrick's claims of error are directed to the court's factual determinations.

voluntariness inquiry were entitled to a "presumption of correctness," while the legal question of voluntariness was not. *See Marshall v. Lonberger*, 459 U.S. 422, 431–32 (1983); *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996); *Collazo*, 940 F.2d at 415; *Iaea v. Sunn*, 800 F.2d 861, 864 (9th Cir. 1986). Thus, we presume the California Supreme Court's findings that Kirkpatrick was competent to withdraw his habeas petition and that his withdrawal was voluntary, knowing, and intelligent are correct unless Kirkpatrick rebuts them by clear and convincing evidence.

## 2. Whether Kirkpatrick can rebut the California Supreme Court's finding of waiver

To waive a petitioner's right to further habeas proceedings, the petitioner must be competent and his waiver must be voluntary, knowing, and intelligent. *Rees v. Peyton*, 384 U.S. 312, 313–14 (1966); *Dennis ex rel. Butko v. Budge*, 378 F.3d 880, 889 (9th Cir. 2004). A petitioner is competent to waive further habeas proceedings so long as he lacks a mental disease, disorder, or defect that substantially affects "the prisoner's capacity to appreciate his options and make a rational choice among them." *Dennis*, 378 F.3d at 889 (emphasis omitted) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 166 (1990)). Whether a waiver is voluntary, knowing, and intelligent involves two distinct inquiries. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* And second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* A petitioner's waiver of his right to proceed is voluntary, knowing, and intelligent where his "statements to the court

demonstrate that he appreciates the consequences of his decision, that he understands the possible grounds for appeal but does not wish to pursue them, and that he has a reason for not delaying execution." *Dennis*, 378 F.3d at 889.

Important here, we are not tasked with determining whether Kirkpatrick was competent to waive his state habeas exhaustion petition and whether his waiver was voluntary, knowing, and intelligent. We are tasked only with deciding whether Kirkpatrick has presented clear and convincing evidence to rebut the California Supreme Court's finding that Kirkpatrick validly waived his state habeas exhaustion petition. Kirkpatrick offers several arguments why his waiver of his state habeas exhaustion petition was invalid, but none of his arguments provide clear and convincing evidence that the California Supreme Court's waiver determination was wrong.

Kirkpatrick first argues that his handwritten letter to the California Supreme Court stating that he wished to withdraw his state habeas exhaustion petition is insufficient to constitute waiver because it does not demonstrate that his waiver was voluntary, knowing, and intelligent. Along that same line, Kirkpatrick argues that his waiver was invalid because he was never questioned on the record about his decision, and without such a colloquy a factfinder could not determine whether his waiver was knowing and intelligent.

While Kirkpatrick's handwritten "Waiver Form" on its own is likely not enough to establish that he was competent to waive his state habeas exhaustion petition and that his waiver was voluntary, knowing, and intelligent, the California Supreme Court had other evidence before it when it determined Kirkpatrick's waiver was valid. After the referee concluded the evidentiary hearings, he submitted a written report to the California Supreme Court (along with

the hearing transcripts, Dr. McEwen's report, and copies of other relevant records) containing substantial evidence that Kirkpatrick desired to waive his state habeas exhaustion petition. For example, in a colloquy with the referee when Kirkpatrick first participated in the proceedings, he was asked what he "would like to accomplish at the bottom line in this process," to which Kirkpatrick responded, "Competency and vacating of the appeal." During the same hearing, Kirkpatrick demonstrated that he understood the potential consequences of waiving his petition:

> [Warden]: If he is raising an issue in the State Court that's not previously been exhausted, and you go to Federal Court and try to raise it, we can make a claim and the Federal Court buys that and says, "You can't litigate that issue as good as you may think it is." It might limit your possibilities of what you can raise in Federal Court.
>
> [Kirkpatrick]: I understand that my writ for exhaustion is already filed by the PD's office.
>
> [Warden]: If you withdraw that, then it won't have the impact of doing the exhaustion because it will be withdrawn. There is a potential that when we go back to Judge Keller's courtroom and you withdraw it, you can't raise it there again. There is a possibility he might do that.
>
> [Kirkpatrick]: I can appreciate that.

[Warden]: So that means if you say, "Gee, I changed my mind," he may say, "Mr. Kirkpatrick, sorry, you can't raise it."

[Kirkpatrick]: You are looking out there, Robert. Thanks.

At the end of the first hearing, Referee Judge Graham told Kirkpatrick that although it was "only a preliminary observation . . . I can tell you right now based upon what I have seen here today, I don't see that you have any mental or emotional limitations that would get in the way of your being a perfectly rational and intelligent participant in the litigation process."

Additionally, Dr. McEwen, the only psychologist to interview Kirkpatrick personally, testified that she "believe[d] he ha[d] the capacity" to "appreciate his position and make a rational choice with respect to continuing or abandoning further litigation." And she did not think Kirkpatrick was suffering "from a mental disease, disorder or defect which may substantially affect his capacity" to forgo rationally further litigation.

Rather, Dr. McEwen thought Kirkpatrick's actions were part of a "conscious, deliberate set of responses that provide him with a certain degree of pleasure. The reward being attention, slowing down of the process." She observed that Kirkpatrick's hope was to gain "more and more control over his case" through hiring different lawyers or representing himself. The referee asked Dr. McEwen, "[A]ssuming that he has made the decision to proceed on his own and represent himself, was that a knowing, intelligent, and voluntary decision of his?" Dr. McEwen opined, "yes."

Dr. McEwen's written report reiterated her "medical opinion that [Kirkpatrick] shows no evidence of mental impairment which would diminish his capacity to make a knowing, intelligent and voluntary decision pertaining to his legal choices." Rather, "[t]he clinical evidence suggests that he indeed made his decision to withdraw his petition in a conscious, goal-directed manner, free of any intervening mental illness."**[6]**

---

**[6]** Kirkpatrick argues that the referee erred in determining he was competent to waive his state habeas exhaustion petition because he failed to order Kirkpatrick to submit to competency determinations by the FPD's experts, failed to order Kirkpatrick to be examined in an inpatient psychiatric facility, failed to require Kirkpatrick to be examined by a second mental health expert, and failed to videotape Kirkpatrick's interview with Dr. McEwen. Kirkpatrick argues that Dr. McEwen's testimony alone "provided no reliable or reasonable basis for the state court to conclude that Kirkpatrick was competent to waive his [state habeas] exhaustion petition," particularly because the FPD's experts reviewed Dr. McEwen's testimony and found it to be flawed. Kirkpatrick admits, however, that the FPD's experts could not give definitive opinions because they did not interview Kirkpatrick in person.

This argument is flawed. First, the referee could not force Kirkpatrick to attend the evidentiary hearings to determine his competency after Kirkpatrick refused to attend and answer questions. It follows logically that it would have been futile for the referee to order Kirkpatrick to submit to further examinations. And Kirkpatrick cites no authority to support the proposition that the referee was required to take any of these measures. Second, the referee acted reasonably in basing his competency determination on Dr. McEwen's testimony because he found that her opinions were "based upon extraordinary qualifications of training and experience, careful review of the available history, and perhaps the only substantial mental health interview Mr. Kirkpatrick has ever allowed." Finally, even if the district court prematurely determined that Kirkpatrick was competent to waive his state habeas exhaustion

Kirkpatrick also argues that some of his statements to the referee and Dr. McEwen show that he did not want to withdraw his petition to expedite his execution. Rather, he argues that he wanted to exercise more control over his case, which he planned to do through firing his current counsel and then representing himself or hiring black lawyers, with the hope of obtaining a new trial to establish his innocence. On *de novo* review, that argument could provide a basis for considering whether Kirkpatrick's waiver was really knowing or intelligent. But under § 2254(e)(1), it does not amount to the clear and convincing evidence necessary to set aside the California Supreme Court's well supported factual findings. Kirkpatrick clearly desired more control over the proceedings, but that is not evidence that he did not understand or appreciate the consequences of his decision. We are bound by the California Supreme Court's factual conclusion, especially in light of the specific evidence from Dr. McEwen and Kirkpatrick himself that supports it. As to Kirkpatrick's claim that a colloquy on the record is required to validate a waiver, Kirkpatrick cites to no binding authority that a colloquy is required, particularly where the defendant refused to participate in court proceedings where a colloquy would have occurred.[7] Indeed, in *Dennis* we noted that

---

petition, that certainly does not amount to clear and convincing evidence that the California Supreme Court's competency finding was wrong.

[7] We note, however, that where courts have previously found such waivers to be knowing, voluntary, and intelligent, they have done so after the court questions the petitioner on the record regarding his intentions and whether he understands the consequences of the waiver. *See Demosthenes v. Baal*, 495 U.S. 731, 732–35 (1990) (state postconviction court found a valid waiver after an evidentiary hearing at which the petitioner testified that he understood his waiver would result in his death); *Whitmore*, 495 U.S. at 165 (finding valid waiver based on colloquy between counsel and trial court with the petitioner, including a

courts "have a measure of discretion in affording a hearing that is suitable in the circumstances" when determining the validity of a petitioner's waiver. 378 F.3d at 894.

Kirkpatrick urges us to follow the Third Circuit's opinion in *Fahy v. Horn*, 516 F.3d 169 (3d Cir. 2008). There, Henry Fahy was convicted of capital murder and sentenced to death in Pennsylvania. *Id.* at 176. Fahy filed multiple petitions for post-conviction relief. *Id.* at 177. After his third petition for post-conviction relief was denied, Fahy appealed to the Pennsylvania Supreme Court. *Id.* While his appeal was pending, "Fahy filed a handwritten pro se motion" asking the court "to allow him to withdraw his appeal and to waive all collateral proceedings so that his death sentence could be carried out." *Id.* The Pennsylvania Supreme Court remanded his appeal to the post-conviction relief court to conduct a colloquy to determine whether he "fully underst[ood] the consequences of his request to withdraw his appeal and to waive all collateral proceedings." *Id.* On remand, the judge granted Fahy a one-week

---

discussion of the "possible grounds for appeal" he was waiving); *Comer v. Schriro*, 480 F.3d 960, 965–66 (9th Cir. 2007) (en banc) (per curiam); *id.* at 966 (Paez, J. concurring) (describing the district court's "thorough findings, including its finding that Comer understood his legal claims" that he was waiving after hearing Comer's testimony that he "underst[ood] that the merits of his habeas appeal are legally strong . . . but that he wished to halt his legal challenges even so"); *Dennis*, 378 F.3d at 891; *Massie*, 244 F.3d at 1196–97; *see also Fahy v. Horn*, 516 F.3d 169, 183–85 (3d Cir. 2008); *Sanchez-Velasco v. Sec'y of Dep't of Corr.*, 287 F.3d 1015, 1032–33 (11th Cir. 2002); *St. Pierre v. Cowan*, 217 F.3d 939, 947–48 (7th Cir. 2000) (noting the lack of "any kind of proceeding, formal or informal, at which any court was able to assure itself that [the] waiver . . . satisfied the requirements for a knowing and voluntary waiver and that [the petitioner] intended it to be a waiver"). The State has not identified any cases in which a court determined that there was a valid waiver in the absence of such a colloquy.

extension to consider his waiver request. *Id.* at 178. During that week, Fahy changed his mind and signed a sworn affidavit stating that he "no longer wished to waive his appellate rights, that he wanted to proceed with his appeal, and that he desired continued representation by counsel." *Id.* But when he appeared before the judge for a second time, he stated that he changed his mind yet again and that he did not want legal representation nor did he want to pursue further litigation. *Id.* The judge then asked Fahy several questions before informing him that he would tell "the Supreme Court of Pennsylvania that [he was] knowingly waiving all [his] appellate rights and all [post-conviction relief] rights." *Id.* The Pennsylvania Supreme Court subsequently affirmed the post-conviction court's determination that Fahy validly waived his right to further appellate and collateral proceedings. *Id.*

Fahy then filed a motion to stay his execution and an amended federal habeas petition in federal district court. *Id.* The district court held that although Fahy was competent when he waived his right to further appellate and collateral proceedings in state court, he was "improperly induced to waive his rights." *Id.* at 178–79. The government appealed to the Third Circuit. *Id.* As to waiver, the Third Circuit recognized that it must defer to the state court's factual findings under 28 U.S.C. § 2254(e)(1); however, the court refused to defer to the state court's finding of waiver in Fahy's case. *Id.* at 181–87. It held that "when a state court's waiver colloquy fails to reveal whether the requirements of a valid waiver have been met due to procedural infirmities, substantive deficiencies, and an insufficient probing into a defendant's knowledge of the rights he is waiving, the findings by that court concerning the waiver are too unreliable to be considered 'factual determinations.'" *Id.* at 183. Thus, the court held that the trial court's finding of

waiver was not "entitled to the presumption of correctness." *Id.* In so holding, the court emphasized a few important points.

First, the court noted that Fahy's waiver resulted from "procedurally infirm" proceedings because the post-conviction relief court denied his counsel's request to ask Fahy about his waiver, which Fahy had requested in a letter to the court, and the court "explicitly refused to consider any evidence of coercion." *Id.* at 184–85. Second, Fahy expressly stated in his colloquy with the judge that he had not discussed all the issues pertaining to his waiver with his lawyers. *Id.* The court stated that this "inadequate colloquy" did not "reveal that he had any knowledge whatsoever of the purpose of federal habeas corpus or its procedures." *Id.* at 186. Finally, the court emphasized that Fahy's equivocation—that he first filed a handwritten waiver form, then filed a signed affidavit stating he did not want to waive his appellate rights, and then changed his mind again and decided to waive further appellate and collateral proceedings—compelled its conclusion that Fahy's waiver was not knowing and voluntary. *Id.* The court concluded that this "record of equivocation . . . does not support an enforceable waiver," and thus proceeded to review the merits of Fahy's appeal. *Id.* at 187.

The Third Circuit's decision in *Fahy* differs from this case in several significant respects. First, unlike in *Fahy* where the court refused to consider evidence of coercion and was unbothered by Fahy's express statement that he had not discussed his case with his attorneys, Kirkpatrick makes no claim that the referee did not allow him or his counsel the opportunity to discuss whether his waiver was voluntary, knowing, and intelligent. In fact, the opposite occurred: the referee engaged with Kirkpatrick to the extent he could,

noting that it was a "pleasure to talk to [him]" at the first hearing. The court ordered a professional evaluation of Kirkpatrick's competency, and Dr. McEwen interviewed Kirkpatrick for two and a half hours. It was Kirkpatrick who refused to engage with the court and his lawyers after Dr. McEwen assessed his competency.[8] Thus, any "procedural infirmity" that occurred in Kirkpatrick's case was of his own making. Second, and most importantly, unlike the petitioner in *Fahy*, Kirkpatrick never made any affirmative indication that he no longer wanted to waive his state habeas exhaustion petition.[9] In fact, he submitted a nearly identical waiver during his federal district court habeas proceedings. Even if Kirkpatrick's conduct of refusing to participate in the referee's evidentiary hearings supports a counter-finding that he did not want to waive his state habeas exhaustion

---

[8] We do not suggest that Kirkpatrick's refusal to participate in the referee's evidentiary hearing altered the State's burden to prove the validity of his waiver. *See Brewer v. Williams*, 430 U.S. 387, 404 (1977) ("[I]t was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.'" (citation omitted)). Nor did Kirkpatrick's refusal "relieve [the] court of the duty to ensure that a definitive waiver ha[d] occurred before it deprive[d] the petitioner of remedies that are available under state law." *St. Pierre v. Cowan*, 217 F.3d 939, 949 (7th Cir. 2000).

[9] After Kirkpatrick attended the first evidentiary hearing, he refused to attend the following four evidentiary hearings. The referee sent Kirkpatrick two separate letters telling him that if he "actually wish[ed] to withdraw [his] habeas corpus petition, it seems critical that you attend" the evidentiary hearing. Kirkpatrick never responded and never attended the subsequent evidentiary hearings. Kirkpatrick argues that his silence and refusal to attend further evidentiary hearings shows he did not want to waive his state habeas exhaustion petition. But this is not necessarily evidence that Kirkpatrick no longer wanted to waive his state habeas exhaustion petition. It could equally be evidence of Kirkpatrick's unwillingness to cooperate with the court as part of a strategy to delay his court proceedings and execution.

petition, it does not amount to clear and convincing evidence that the California Supreme Court's waiver determination was wrong. His refusal to participate after requesting the opportunity to withdraw his petition—a process he repeated in federal district court—is entirely consistent with Dr. McEwen's testimony that "he has an agenda" and is simply trying to manipulate the process.

Finally, Kirkpatrick argues that his waiver was involuntary because evidence exists to suggest he wrote his "Waiver Form" under duress. Kirkpatrick notes that he wrote multiple letters to the state court asserting that he believed prison guards were trying to kill him, retaliate against him by withholding showers and food, and that the prison denied him medical attention, medication, legal documents, access to the library, and access to the prison yards. Kirkpatrick does not explain how these events influenced his decision to waive his state habeas exhaustion petition. Nonetheless, even if Kirkpatrick's letters to the state court exhibited evidence of duress, both Dr. McEwen and the referee, who talked to Kirkpatrick personally, determined that his waiver was voluntary. Kirkpatrick's assertions do not amount to clear and convincing evidence that the California Supreme Court's finding that Kirkpatrick's waiver was voluntary was wrong.

While we agree that the California Supreme Court's waiver finding was unconventional, ultimately the California Supreme Court was not bound to accept the referee's findings. *See In re Thomas*, 129 P.3d 49, 53 (Cal. 2006). Kirkpatrick has not presented clear and convincing evidence to rebut the California Supreme Court's finding that he validly waived his state habeas exhaustion petition.

Thus, we presume its findings were correct, and affirm the district court's dismissal of Kirkpatrick's waived claims.[10]

## III. CONCLUSION

Because Kirkpatrick cannot show the jury's consideration of the facts that he poisoned Shirley Johnson's dogs and threatened her property had a substantial and injurious effect on the jury's decision to impose the death penalty, Kirkpatrick is not entitled to relief on his Eighth Amendment claim. Additionally, Kirkpatrick has not presented clear and convincing evidence to rebut the California Supreme Court's finding that Kirkpatrick validly waived his state habeas exhaustion petition. Thus, we affirm the district court's denial of federal habeas relief to Kirkpatrick.

**AFFIRMED.**

---

[10] Nothing in this opinion should be construed to minimize or modify the constitutional requirements of a competency determination and a voluntary, knowing, and intelligent waiver.

**Appendix 1**

The district court's independent analysis whether there was evidence to support the California Supreme Court's finding of waiver:

The district court stated, "[t]he evidence supporting the California Supreme Court's findings would include, but is not limited to, the following statements made during status conferences and in the evidentiary hearing before Judge Graham":

> Court: "What is it you would like to accomplish at the bottom line in this process?"
>
> Petitioner: "Competency and vacating of the appeal."
>
>          \* \* \*
>
> Respondent: "If he is raising an issue in the state court that's not previously been exhausted, and you go to federal court and try to raise it, we can make a claim and the federal court buys that and says, 'You can't litigate that issue as good as you may think it is.' It might limit your possibilities of what you can raise in federal court."
>
> Petitioner: "I understand that my writ for exhaustion is already filed by the PD's office."
>
> Respondent: "If you withdraw that, then it won't have the impact of doing the

exhaustion because it will be withdrawn. There is a potential that when we go back to Judge Keller's courtroom and you withdraw it, you can't raise it there again. There is a possibility he might do that."

Petitioner: "I can appreciate that."

Respondent: "So that means if you say, 'Gee, I changed my mind,' he may say, Mr. Kirkpatrick, sorry, you can't raise it."

Petitioner: "You are looking out there, Robert. Thanks."

Respondent: "I am here to do justice. . . . [D]o you understand what I am trying to communicate?"

Petitioner: "Yeah, you are covering your ass."

\* \* \*

Court: "Mr. Kirkpatrick, I know it is only a preliminary observation, but I can tell you right now based upon what I have seen here today, I don't see that you have any mental or emotional limitations that would get in the way of your being a perfectly rational and intelligent participant in the litigation process, and but for the circumstances in which we find ourselves its been a pleasure to talk to you."

\* \* \*

[Psychiatrist] Dr. McEwen: "He made it quite plain that he knew why I was there."

Court: "What did he say to you?"

Dr. McEwen: "He recognized that I was coming to talk to him about all these things that you see. We talked about coming in to this courtroom and talking to this Judge, and he talked about you and he talked about the Attorney General. So it was quite plain to me that he knew this was in response to some of his—it was in direct response to some of his requests in his case . . . ."

Dr. McEwen: "There's not a clear—it should be obvious that there's not a clear step-by-step plan that is particularly realistic. In the back of my mind I thought this person may simply be trying to stymie everybody else's efforts on his case. I had that impression from his written material and from seeing him in person."

Dr. McEwen: "[T]his is apparently a conscious, deliberate set of responses that provide him with a certain degree of pleasure. The reward being attention, slowing down of the process. His hope being that he has more and more control over his case. I want to have you understand that this is someone who has responded to being on death row in a very particular way. It is a combination of the

environment he's in and his particular personality. I think he's conscious of what he's doing. . . . He knew exactly what he was doing with me."

Dr. McEwen: "He thinks that he is going to be found competent. He tells me—he says, "There's nothing wrong with me."

Dr. McEwen: "[H]e certainly has some trends that are like a personality disorder, but these would not be the sorts of things that would interfere with the aforesaid decision-making abilities."

Dr. McEwen: "[B]ut I have to say I think that this man knows what he is doing, has an agenda, doesn't have the slightest interest in being seen as mentally ill. . . . I think I feel pretty strongly that he has character trends, argumentative, contrary character trends and a lot of energetic intelligence to keep himself very much occupied in this pursuit that he is involved in. It is a goal-directed pursuit, and I think that he is trying not just to frustrate people and make people upset, but he's also trying to feel a sense of being in control of his life."

Respondent: "[W]hat is your answer to this question: Whether Mr. Kirkpatrick has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation?"

Dr. McEwen: "I believe he has the capacity to do that."

Respondent: "Secondly, whether Mr. Kirkpatrick is suffering from a mental disease, disorder or defect which may substantially affect his capacity to do those things?"

Dr. McEwen: "I believe he does not suffer from that type of condition."

. . . .

Respondent: "Assuming that he has made the decision to proceed on his own and represent himself, was that a knowing, intelligent, and voluntary decision of his?"

Dr. McEwen: "I would say yes."

The district court also found excerpts of Dr. McEwen's written findings persuasive, as the only psychiatrist to interview Kirkpatrick in person:

"Based upon my examination of Mr. Kirkpatrick and upon review of the documents noted above, it is my medical opinion that he shows no evidence of mental impairment which would diminish his capacity to make a knowing, intelligent and voluntary decision pertaining to his legal choices. He is not suffering from any mental condition or defect that could interfere with either his ability to comprehend his situation

or his ability to make rational decisions regarding litigation."

"The clinical evidence suggests that he indeed made his decision to withdraw the petition in a conscious, goal-directed manner, free of any intervening mental illness."

"He is stimulated by and takes pleasure in confounding the 'powers that be.' Wanting control is a natural human reaction, and not necessarily maladaptive."